**UNITED STATES of America,**
**Appellant,**

v.

**Sheldon A. JOHNSON, Reginald Colbert.**
**No. 23900.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 28, 1970.

Decided March 22, 1971.

---

Bazelon, Chief Judge, concurred and filed opinion.

Mr. Richard A. Hibey, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., John A. Terry, Asst. U. S. Atty., and Terry P. Segal, Asst. U. S. Atty., at the time the brief was filed, were on the brief, for appellant.

Mr. John Bodner, Jr., Washington, D. C., with whom Mr. Stanley J. Krieger, Washington, D. C. (both appointed by this court) was on the brief, for appellee Johnson.

Mr. Stanley Dietz, Washington, D. C. (appointed by this court) for appellee Colbert.

Before BAZELON, Chief Judge, WILBUR K. MILLER, Senior Circuit Judge, and McGOWAN, Circuit Judge.

McGOWAN, Circuit Judge:

This is an appeal by the Government, authorized by Section 1301 of the Omnibus Crime Control and Safe Streets Act (82 Stat. 237, amending 18 U.S.C. § 3731), from a grant by the District Court of a pretrial motion to suppress evidence, in this case narcotics. Appellees were under indictment for violations of two federal narcotics statutes, 26 U.S.C. § 4704(a) and 21 U.S.C. § 174. Our reading of the testimony leads us to the conclusion that the District Court's ruling did not take account of one critical undisputed fact, namely, that the narcotics were observed in plain view by the arresting officer in the course of an investigatory stop which the officer was fully authorized to make. For this reason, we reverse.

## I

At the hearing on the motion to suppress, only one witness testified. That was Officer Herring, a ten-year police veteran with prior narcotics training and experience. Our summary of his testimony is derived directly from the transcript, a fact we emphasize because the District Court did not make findings of fact as such; and, in the examination of the witness as well as in arguments to this court, there has been some exploration and emphasis of matters which are not central to the circumstance we regard as controlling.

Officer Herring testified that, at about 11:17 on the night of April 13, 1969, he was driving a scout car, accompanied by Officer Anderson, in the right lane of the 1200 block of New York Avenue, going west. The scout car was passed on its left by a 1968 Chevrolet with three men in the front seat. Herring noticed that the right vent window was broken, and that the rear license plate did not have on it a 1970 sticker as required by law. Thinking from these facts that the car might be stolen, and possessed of authority in any event to investigate the absence of the sticker, Herring immediately turned on his red dome light, indicating that the car should pull over to the side of the street and stop. The Chevrolet did not stop but continued for a full block through the 13th street intersection,

closely followed by the scout car. At this point Herring turned on his siren as a further signal for the Chevrolet to stop. Instead, it continued up to the intersection at New York Avenue and H Street. The red traffic light was against the Chevrolet at this intersection. It paused momentarily, but started up again to cross against the red light. Its motor stalled and died, however, before it made it through the intersection. Herring stopped the scout car in the middle of the intersection behind the Chevrolet and made his way as speedily as he could to the driver's side of the Chevrolet. His partner, Officer Anderson, ran around to the other side of the Chevrolet.[1]

As Herring approached the driver's side of the Chevrolet, its driver, appellee Johnson, opened the door and was in the process of getting out when Herring came up.[2] In response to a question as to whether he could see into the car at that time, Herring said:

"Johnson got out of the car and I stopped him at the car and I did see inside the car, yes, sir.

\* \* \* \* \* \*

"I wasn't looking for anything particularly but just when he stepped out of the car, the dome light [of the Chevrolet] is on and you can see the inside of the car. At this time I saw a bunch of little white capsules laying around on the floor."

Herring's testimony was that, by the time he reached the Chevrolet, appellee Johnson was out of the car and standing, with the car door swung wide open and the car's dome light, accordingly, on. Herring asked Johnson for his driver's permit and registration and simultaneously searched him:

"Q. How did you search him?

A. Just frisked him.

Q. A quick frisk?

A. Yes.

\* \* \* \* \* \*

Q. And you just walked up to him and patted him down?

A. That's right."

Herring testified that the other two passengers were still seated in the car at this point, but that his partner Officer Anderson, stated that he was ordering appellee Colbert to get out of the car because he appeared to be holding something in his hand.

The direct examination of Herring by the defense then turned to what articles were seized by the police. Herring testified that they were (1) $188 in currency, which was what appellee Colbert was holding in his hand, and (2) 50 heroin capsules and a plastic green bottle. After defense counsel took Herring through a detailed description of the capsules and the bottle, the following colloquy occurred:

"Q. When did you see these capsules?

A. Oh, right then. After we put the gentlemen in the wagon—called for the wagon and put them in the wagon.

Q. And you placed them under arrest? Did you tell them what they were under arrest for?

A. Yes, sir.

Q. What was that?

A. Johnson would be traffic violation and suspected narcotics.

Q. Suspected, but not for stealing the car?

A. No, sir.

Q. When you checked his license— checked his license and registration, that appeared in order?

A. Yes, sir.

1. Another police cruiser happened to be going in the same direction on the same street. Seeing the scout car's chase of the Chevrolet stalled in the street intersection, it drove around in front of the Chevrolet to block its starting off again. The officers in the cruiser were present during the events related by Officer Herring, but they played no significant role in them.

2. Herring testified that Johnson and the other occupants were completely unknown to him and that he had never seen them before.

Q. At the time you stopped this car at about 11:15 or 11:17, didn't you suspect or have a hunch that you would find narcotics in this car?

A. No, sir.

Q. You had no idea whatsoever?

A. No, sir."

Herring then testified that the capsules were lying scattered over the left front floorboard, "where the driver's feet would be." Then this exchange occurred:

"Q. Would you—could you immediately identify these capsules—did you immediately identify these capsules that were lying on the floor?

A. I didn't immediately, no sir. I suspected what they were and the field test was made approximately fifteen or twenty minutes after that and it was positive."

Herring asked the occupants of the car who the capsules belonged to, and "all three denied any knowledge that they were on the floor." Herring was then asked whether he "searched the defendant prior to the time you saw these capsules," and he replied in the affirmative, presumably referring to his earlier account of the protective frisk which he gave Johnson. In response to a question as to whether he advised Johnson of his rights, Herring testified that, at approximately 11:18 or 11:19, he told Johnson that he was "under arrest for suspected narcotics and a traffic violation," and that he did not have to make any statement. He explicitly said he did not place Johnson under arrest for auto theft because the latter's permit and registration checked out. Johnson, said Herring, was "automatically locked up for traffic violations and immediately after I observed the capsules on the floor of the automobile." Herring further testified that, after Johnson and Colbert had been placed in the police wagon which had been promptly summoned, he looked under the front and back seats of the car but found nothing more.

The examination of Herring by counsel for appellee Colbert sought to show that Herring had acted contrary to police practice in taking appellee Johnson to the stationhouse for a traffic violation. Herring's response was that he regarded the matter as aggravated because Johnson did not respond to his signals to stop, resulting in a second law violation by reason of his running a red light.[3] Colbert, said Herring, was arrested for a narcotics violation. In this examination, Herring again responded affirmatively when asked if he saw the capsules inside the car after he had placed Johnson under arrest. A later colloquy, however, suggested that Herring differentiated between his first sight of the capsules and his later collection and close examination of them:

"Q. When did you pick up these fifty capsules?

A. After we placed the subjects in the wagon.

Q. When they were in the wagon?

A. Yes.

Q. And you put the capsules into the green vial?

A. Yes.

Q. Did they all fit in?

A. Yes, sir, they did.

Q. Did you find in the automobile a cap for that green vial?

A. That's right.

Q. Where did you find that?

A. Laying on the floor, loose on the floor.

---

3. "Q. Well, is it automatic with you that you lock up everybody that you stop for a traffic violation?
A. Yes, sir, because he had ample time to pull over to the curb and he did not pull over.

Q. So you automatically locked him up because he didn't pull over to the curb in time?
A. That's right."

Q. In the same area?

A. Yes, sir.

Q. When you say that same area, you mean around the area of the driver's feet, where the driver's feet would be?

A. Yes."

Government counsel asked no questions of the witness. The testimony ended with this exchange between the court and the witness:

"THE COURT: All right. Officer Herring, you testified that you placed the Defendant Johnson under arrest immediately as he stepped out of the car?

THE WITNESS: Yes, sir.

THE COURT: That is before you saw the white capsules?

THE WITNESS: Right.

THE COURT: What did you charge him with at that time?

THE WITNESS: Stopped him for traffic violation.

THE COURT: Did you tell him what traffic violation?

THE WITNESS: Yes, sir.

THE COURT: Do you ordinarily search a man for a traffic violation?

THE WITNESS: Like I say, I suspected it being a stolen vehicle before I saw the registration and permit for the car.

THE COURT: You may step down."

After hearing the arguments of counsel, the court, in a brief statement, granted the motion to suppress on the ground that, in the light of our decision in Hill v. United States, 135 U.S.App.D.C. 233, 418 F.2d 449 (1968), "this has to be held a sham arrest, the purpose being that the officer was looking for something." The court prefaced this conclusion with the observations that it did not believe there was probable cause to arrest for auto theft, and that the chief cause of the court's concern was that appellee Johnson "was placed under arrest immediately as he stepped out of the car, that is, even prior to the officer discovering the capsules."

## II

With all respect, we do not believe the testimony as given justifies the legal conclusion drawn by the District Court that the evidence must be suppressed. The fatal gap in the reasoning is that the record is devoid of any evidence that the narcotics were discovered by a search incident to an arrest, sham or otherwise. The undisputed testimony is, rather, that the narcotics were revealed in plain view by the action of appellee Johnson in getting out of his car when approached by Officer Herring—an action which caused the car door to swing wide open, thereby turning on the car's interior dome light and revealing the narcotics lying on the car floor on the driver's side. Thus, even if the custodial arrest for traffic violations, as distinct from the stop and the mere issuance of non-custodial citations, be considered sham, the disclosure of the narcotics was not the consequence of a search incident to that arrest.

It is not disputed in this record that appellee Johnson did get out of the car leaving the door open and the car floor illuminated by the automatic lighting of the interior dome light, and that the capsules were thereby put in plain view of anyone approaching the car on lawful business.[4] Neither is there any question

4. Hiet v. United States, 125 U.S.App.D.C. 338, 372 F.2d 911 (1967), is remarkably close on its facts. There, a police scout car gave chase to an auto which was seen to run a red light. The offending car fled, pursued by the scout car with red light flashing and siren sounding. The pursued auto struck some parked cars, and its driver jumped out. The opening of the car door turned on the dome light, enabling the police to see two U.S. mail bags inside. They seized the bags. It was argued that the seizure was improper because it was accomplished without a search warrant, and that the evidence they represented should have been suppressed.

but that, in the circumstances shown by this record, Herring was lawfully entitled to approach the car, to require the driver to get out (if that had been necessary, which it was not here because of Johnson's voluntarily doing so), and to give him a protective frisk for weapons. *See* Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

Even if it be assumed that Herring's decision to make a custodial arrest of Johnson at that point for traffic violations was unwarranted and contrary to departmental practice, and even if it be assumed that Herring did not actually see the capsules until he had made this kind of an arrest, the fact would remain that he then did, at the latest, see the capsules in plain view. That sight would clearly have entitled him to make a narcotics arrest, as he did of all three occupants of the car, and one whose legality would not turn upon an incidental search either of the person or of the car.[5]

If the District Court did not believe Herring's testimony, and concluded rather that the capsules were not in plain view but were revealed only when a search was made of the interior of the car after the traffic violation arrest, it should have made a credibility determination to that effect. But it did not, and the testimony about plain view stands unimpeached. In this state of the record, a legal conclusion, however correct, as to the sham character of the custodial arrest, as distinct from the investigatory stop and an ensuing citation, does not support the suppression of this evidence and requires reversal. The Supreme Court settled this matter in Harris v. United States, 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968), where it said:

> "It has long been settled that objects falling in the plain view of an officer *who has a right to be in the position to have that view* are subject to seizure and may be introduced in evidence. Ker v. State of California, 374 U.S. 23, 42–43, 83 S.Ct. 1623, 1634, 1635, 10 L.Ed.2d 726 (1963); United States v. Lee, 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202 (1927); Hester v. United States, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924)". (Emphasis supplied.)

Although not essential to our decision, we think it appropriate to add that it seems to us by no means certain that this arrest was sham. The testimony is consistent with a purpose on Herring's part to take Johnson into custody, as distinct from issuing a citation, because of the latter's failure to stop when signalled to do so, and his apparent purpose to try to escape by running a red light. As we read the departmental instructions, such a purpose would appear to have fallen within the limits of the policies set forth therein.[6]

Approaching the car late at night, Herring was certainly entitled to give Johnson a protective frisk when he confronted him—a circumstance that is in any event irrelevant, since that frisk disclosed nothing. It may be that Herring did not actually see the capsules until after he had completed this part of his business. His testimony looks in both directions on this score, as appears from our recital of it above; and he was afforded none of the clarifying help which might have been provided if the prosecutor had asked him some questions.

---

5. The third person in the car proved to be a juvenile, and was not proceeded against in the District Court.

6. General Order No. 3, Series 1959, dated April 24, 1959, of the Metropolitan Police Department states in part:

 Only in the more serious or aggravated types of traffic violations, those which indicate a serious disregard for the safety of others, or those in which the officer has reasonable grounds to believe that the individual concerned will, in all probability, ignore the Traffic Violation Notices, should it be necessary to make summary arrest. * * *"

But the record stands that he saw the capsules without any need to search the car, and that is why there is no basis for suppressing the evidence found in that manner.

Our decision in *Hill,* upon which the District Court relied, is not to the contrary. That case involved a purported arrest of a robbery suspect for making major repairs to his car in a public thoroughfare. Pursuant to this arrest, the suspect was taken into custody and to the police station, where he was required to empty his pockets. An item so turned up was incriminating with respect to the robbery. Appellant was detained further while the victim was brought to the stationhouse to make an identification. Upon an appeal for conviction of that crime, it was urged that the incriminating document and the identification should be suppressed as incident to a sham arrest. At trial appellant was denied the opportunity to inquire into the usual police procedures in the case of a traffic violation of this kind, for the purpose of showing that the custodial arrest in this instance was a sham. We held it error for the court to foreclose this inquiry, and we remanded the case for such an inquiry.

In the case before us, Officer Herring testified flatly, and without challenge, that the occupants of the Chevrolet were unknown to him and that, so far as he knew, he had never seen them before. He asserted that he did not have narcotics in mind when he decided to pursue the Chevrolet and to require it to stop. His interest was originally aroused solely by the sight of the broken vent window and the apparent tag violation. That interest accelerated, not unnaturally, when first his red flashing light, and then his siren, were ignored, even to the point of running a red light.

It is not seriously claimed by appellees, as it could not be, that Officer Herring had no right to do everything he did up until the time he made a custodial arrest. Even if that be thought to be a departure from police department policy, and that a mere citation should have been issued instead, the record shows that the narcotics were in plain view without the aid of a search, and Johnson could, as appellee Colbert was, be arrested for narcotics violations. On this record, it is the plain view which affords the probable cause for the narcotics arrests, and the plain view was not come by under improper circumstances. There is, thus, really no question presented as to the fruits of an illegal search.

The order granting the motion is reversed, and the case remanded to the District Court for further proceedings consistent herewith.

It is so ordered.

BAZELON, Chief Judge (concurring):

I concur in the court's opinion, but because of the importance of the rules relating to searches incident to sham arrests,[1] I think it is important to emphasize the narrowness of the holding in this case.

Officer Herring had grounds to be suspicious that this car may have been stolen because he observed that a proper registration sticker was missing and that the right vent window was broken. Because absence of the registration sticker is a traffic code violation, Officer Herring had the authority to stop the car, ask the driver for his license and registration, and issue a summons. The request for license and registration would have resolved his suspicions about whether the car was stolen; that this may have been his motive for stopping the car for the traffic violation does not by itself make the stop a sham. I believe *Hill* and *Taglavore* would compel a different result, however, where the officer stopped a car for a traffic violation in the hopes of turning up evidence of another crime in the course of a thorough frisk for weap-

---

1. Hill v. United States, 135 U.S.App.D.C. 233, 418 F.2d 449 (1968); Taglavore v. United States, 291 F.2d 262 (9th Cir. 1961).

ons or in the course of any other search permitted by law. There is no evidence in this case that Officer Herring had such an intention.

Defense counsel and the trial judge focussed their attention on testimony to the effect that the narcotics capsules were sighted *after* Johnson was placed under arrest. I agree with the court's opinion that the evidence at the hearing nevertheless compels the conclusion that the capsules came into plain view because of Johnson's action in getting out of his car when approached by Officer Herring and not because of a "search" incident to the arrest. Given that it was proper to stop Johnson's car, therefore, Officer Herring was validly in a position to see the capsules whether or not he lawfully placed Johnson under arrest.