**Roosevelt F. PALMORE, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 5831.**

District of Columbia Court of Appeals.

Argued Oct. 19, 1971.

Decided April 28, 1972.

Frank F. Flegal, Washington, D. C., for appellant.

James A. Adams, Asst. U. S. Atty., with whom Thomas A. Flannery, U. S. Atty., John A. Terry and Warren R. King, Asst. U. S. Attys., were on the brief, for appellee.

Before KELLY, KERN and NEBEKER, Associate Judges.

KERN, Associate Judge:

Appellant was tried and convicted in the Superior Court of the District of Columbia of a "local" felony, that is, carrying a dangerous weapon (a pistol), after having sustained a prior felony conviction, D.C.Code 1967, § 22–3204.[1] He contests the jurisdiction of the Superior Court to hear his case[2] because he alleges that only a feder-

1. The full facts of this case are set forth in Part II of the opinion.

2. The "District of Columbia Court Reform and Criminal Procedure Act of

al court created under article III of the Constitution has jurisdiction over a felony proscribed by Congress and prosecuted in the name of the United States. Appellant also launches an attack upon the validity of (1) a search of and seizure from his automobile, and (2) a decision by the Government to prosecute him under one statute rather than another. After a review of each of his contentions, which have been ably and vigorously presented in briefs and supplemental memoranda submitted at our request after oral argument, we *affirm* his conviction.

## I.

Appellant bases his formidable challenge to the jurisdiction of the Superior Court and this court upon the language of article III which states that the judicial power of the United States shall extend to all cases arising under the laws of the United States and to which the United States is a party.[3] He points out (a) that the sections of the D.C.Code, despite being applicable only to the District of Columbia, constitute the "Laws of the United States," Metropolitan R. R. Co. v. District of Columbia, 132 U.S.

1, 9, 10 S.Ct. 19, 33 L.Ed. 231 (1889) (dictum); Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 426, 5 L.Ed. 257 (1821) (dictum), and (b) that the United States is a party to any case in which it prosecutes an individual for a violation of the D.C.Code.

■ Appellant contends that when a case or controversy, such as his, falls within the "judicial Power of the United States," as defined in article III, Congress cannot constitutionally confer jurisdiction over that case upon a non-article III court. He acknowledges that Congress has created under article IV[4] courts without life tenure for their members to sit in the federal territories and that these courts do have jurisdiction over cases and controversies arising under the laws of the United States and to which the United States is a party. O'Donoghue v. United States, 289 U.S. 516, 53 S.Ct. 740, 77 L.Ed. 1356 (1933); American Insurance Co. v. Canter, 26 U.S. (1 Pet.) 511, 7 L.Ed. 242 (1828); United States v. Montanez, 371 F.2d 79 (2d Cir.), cert. denied, 389 U.S. 884, 88 S.Ct. 147, 19 L.Ed.2d 181 (1967). However, he relies upon the fact that the Supreme Court has emphatically recog-

1970," Pub.L.No. 91–358, 84 Stat. 475 (1970) vests jurisdiction in the Superior Court of the District of Columbia over criminal cases under any law applicable exclusively to the District. Such jurisdiction vests in two stages over an eighteen month period, commencing with the effective date of the Act, 84 Stat. 486, D.C.Code 1967, § 11–923 (Supp. IV, 1971). The Act vests in this court jurisdiction over the appeals from all final orders and judgments of the Superior Court, 84 Stat. 480, D.C.Code 1967, § 11–721 (Supp. IV, 1971). Under the Act, the Superior Court and this court receive their judicial power from Congress pursuant to article I of the Constitution, 84 Stat. 475, D.C.Code 1967, § 11–101(2) (Supp. IV, 1971). The Court Reform Act further provides that the judges of the Superior Court and this court shall be subject to tenure, salary, and removal provisions which are not within the confines of article III (see note 3, *infra*), 84 Stat. 491, D.C.Code 1967, § 11–1502 (Supp. IV, 1971); 84 Stat. 479, 482, D.C.Code 1967, §§ 11–703, 904 (Supp. IV, 1971);

84 Stat. 492, D.C.Code 1967, § 11–1521 (Supp. IV, 1971).

3. U.S.Const., art. III reads in pertinent part:

Section 1. The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.

Section 2. The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States . . . .

4. U.S.Const., art. IV, § 3, cl. 2 reads in pertinent part:

The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . . .

nized the significant constitutional distinction between territorial courts and the District of Columbia courts. O'Donoghue v. United States, *supra*, 289 U.S. at 538, 53 S. Ct. 740, 77 L.Ed. 1356.[5]

In further support of his argument,[6] appellant notes that individuals charged with violations of "local" felonies in the District have been tried by federal courts created under article III, at least since 1863, when the predecessor of the present United States District Court for the District of Columbia was created by Congress.[7]

█ We believe that neither case law nor history and logic support appellant's argument that Congress *must* vest jurisdiction over local felonies *only* in article III courts. We conclude that Congress, in the exercise of its plenary power under article I,[8] has the constitutional power to pro-

5. The Government contends (a) that the distinction drawn by the decision in O'Donoghue v. United States, 289 U.S. 516, 53 S.Ct. 740, 77 L.Ed. 1356 (1933) (which we discuss fully in n. 15, *infra*), may no longer be sound, and (b) that Congress should be given the same freedom in fashioning local District courts under article I as it has enjoyed in creating the territorial judicial systems under article IV. The Government argues that, as is true with respect to the territories, (i) Congress does have plenary legislative power over the District, a specific geographic area; and, (ii) the area may someday become a state (or enjoy such local control that it is able to act independently of Congress) capable of creating its own judicial system so as no longer to be in need of a large number of lifetime article III judges whose principle function had been to adjudicate local matters, *see* Glidden Co. v. Zdanok, 370 U.S. 530, 545–546, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962).

Notwithstanding a certain appeal of the Government's position, this court is, of course, still bound by the Supreme Court's decision in *O'Donoghue*, which unambiguously rejected the notion that Congress could exercise the same power over the courts of the District as it does with respect to the territorial judicial systems.

6. *See also* Note, Legislative and Constitutional Courts, 71 Yale L.J. 979, 1010–1011 (1962); and Note, The Distinction Between Legislative and Constitutional Courts and its Effect on Judicial Assignment, 62 Colum.L.Rev. 133, 154 (n. 149) (1962), which take the position that as to D.C. felonies, there appears to be no justification for avoiding the provisions of article III concerning lifetime judges and undiminishable salary, especially in view of the close proximity between the Congress and the local courts.

7. From 1801 until 1838, exclusive jurisdiction over local felonies committed in the District was vested by Congress in the circuit court of the District of Columbia (and the chief circuit judge sitting as a district judge) which was the only existing court of either general or federal jurisdiction in the District. The judges of the circuit court exercised the same powers, and enjoyed the same salary and tenure, as did the circuit judges sitting on inferior federal courts created by virtue of article III in the several states, 2 Stat. 103–106 (1801); 2 Stat. 155, 166 (1802).

In 1838, Congress created the criminal court of the District of Columbia which assumed the jurisdiction over all criminal offenses committed in the District which had been vested in the circuit court. The judge on the criminal court did not enjoy the same salary as judges on the inferior federal courts nor did the statute specify (as did the statute creating the circuit court), whether this judge enjoyed the tenure of inferior federal court judges, 5 Stat. 306 (1838). *Compare* 2 Stat. 660 (1811) and 3 Stat. 457 (1818).

The criminal court was abolished in 1863 and its jurisdiction was transferred to the newly created supreme court of the District of Columbia which also enjoyed the same powers as federal district courts created under article III in the several states, 12 Stat. 762, 763 (1863). It was not until 1933, however, that the Supreme Court decided that the supreme court of the District of Columbia was created by Congress by virtue of article III, O'Donoghue v. United States, *supra*. *See generally* Glidden Co. v. Zdanok, *supra*, 370 U.S. at 539, 82 S.Ct. 1459, 8 L.Ed.2d 671 and the briefs submitted by the Solicitor General (at 41), and by Roger Robb, (now a judge of our federal Circuit Court), amicus curiae (at 20 *et seq.*) in the latter case.

8. U.S.Const., art. I, § 8, cl. 17 reads in pertinent part:

The Congress shall have Power . . . [t]o exercise exclusive Leg-

scribe certain criminal conduct only in the District and to select the appropriate court, whether it is created by virtue of article III or article I, to hear and determine these particular criminal cases within the District.

■ We begin with the established proposition that Congress, at least with respect to courts in the District, is enabled by the District Clause (U.S.Const., art. I, § 8, cl. 17) to confer a "judicial power," wholly separate and apart from its authority under article III to confer judicial power on inferior federal courts. National Mutual Insurance Co. of District of Columbia v. Tidewater Transfer Co., 337 U.S. 582, 69 S.Ct. 1173, 93 L.Ed. 1556 (1949);[9] Kendall v. United States, 37 U.S. (12 Pet.) 524, 619, 9 L.Ed. 1181 (1838); Lurk v. United States, 111 U.S.App.D.C. 238, 296 F.2d 360 (1961), aff'd on different grounds, Glidden Co. v. Zdanok, 370 U.S. 530, 82 S. Ct. 1459, 8 L.Ed.2d 671 (1962); Western Urn Manufacturing Co. v. American Pipe and Steel Corp., 109 U.S.App.D.C. 145, 284 F.2d 279 (1960), sustained, 113 U.S.App. D.C. 378, 308 F.2d 333 (1962); Pang-Tsu Mow v. Republic of China, 91 U.S.App.D. C. 324, 201 F.2d 195 (1952), cert. denied, 345 U.S. 925, 73 S.Ct. 784, 97 L.Ed. 1356 (1953). Congress has not only utilized the District Clause to vest in article III courts here jurisdiction over cases and controversies *not arising under article III, e. g.*, National Mutual Insurance Co. of District of Columbia v. Tidewater Transfer Co., *supra* (diversity jurisdiction outside of article III limitations); Kendall v. United States, *supra* (common law mandamus); Western Urn Manufacturing Co. v. American Pipe and Steel Corp., *supra* (suits between nonresident corporations); Pang-Tsu Mow v. Republic of China, *supra* (suits between aliens); but Congress has *also* employed the District Clause to permit non-article III judges to hear and determine local misdemeanors [10] and local felonies, Lurk v.

islation in all Cases whatsoever, over such District . . . as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States . . . .

9. Although the four separate opinions filed in *Tidewater* each expressed a different view as to the power of Congress under the District Clause to clothe inferior federal courts in the several states with jurisdiction over matters outside of article III, each opinion did concede that Congress can confer some measure of judicial power under article I upon courts in the District of Columbia, Nat'l Mut. Ins. Co. of District of Columbia v. Tidewater Transfer Co., 337 U.S. 582, 591–592, 600, 608–609 (Rutledge, J., concurring); 641, 643, 69 S.Ct. 1173, 93 L.Ed. 1556 (Vinson, J., dissenting); 655 (Frankfurter, J., dissenting) (by inference).
*See also* the remarks by Mr. Justice Frankfurter at the oral argument in Glidden Co. v. Zdanok, *supra*, with regard to the power of Congress to vest jurisdiction over local felonies in non-article III courts in the District of Columbia, 30 U.S.L.W. 3261–3263 (1962).

10. Appellant concedes that the power to hear cases involving misdemeanor violations of the D.C.Code has been constitutionally vested by Congress in local courts not created by virtue of article III whose judges have always served for a period of years with compensation unequal to that received by judges on inferior federal courts. This includes the justices of the peace who had jurisdiction over local misdemeanors prior to the creation of the police court in 1870 (16 Stat. 153) and continuing on through to the judges of the municipal court who received the police court jurisdiction in 1942 (56 Stat. 190) until the predecessor of the present Superior Court, the Court of General Sessions, received this jurisdiction in 1963 (77 Stat. 487). The Supreme Court's reference in Callan v. Wilson, 127 U.S. 540, 8 S.Ct. 1301, 32 L.Ed. 223 (1888) to the article III right to criminal jury trial before a local justice of the peace court has not been interpreted as a recognition of article III status of that court, but rather, that the fifth and sixth amendment rights to due process of law and criminal jury trial are applicable to all criminal trials in the District of Columbia, *see* Nat'l Mut. Ins. Co. v. Tidewater Transfer Co., *supra*,

United States, *supra*,[11] Bradford v. Greene, Civil Action No. 3527-70 (D.D.C.1971), aff'd on other grounds, 142 U.S.App.D.C. 237, 440 F.2d 265 (1971). If Congress, within the District, can *constitutionally* vest a species of judicial power upon District courts free of the limitations contained in article III, then it follows that Congress, in the exercise of its "necessary and proper powers" under U.S.Const., art. I, § 8, cl. 18, is entitled to fashion an entire court system, free of the tenure and salary limitations imposed by article III, to receive this same judicial power over "local" crimes and civil cases.

■ There may be, of course, substantial and persuasive reasons for creating all courts in the District with lifetime tenure and undiminishable salary for judges so as to be completely free of possible legislative influence. *See generally* O'Donoghue v. United States, *supra*, 289 U.S. at 531–533, 53 S.Ct. 740, 77 L.Ed. 1356; Evans v. Gore, 253 U.S. 245, 253, 40 S.Ct. 550, 64 L.Ed. 887 (1920); Legislative and Constitutional Courts, 71 Yale L.J., *supra* at 1010–11; The Distinction Between Legislative and Constitutional Courts, 62 Colum.L.Rev., *supra* at 154 n. 149. However, Congress has chosen in its legislative wisdom to follow the example of numerous states [12] which do not provide for such tenure or salary,

and we find this choice to be a legitimate means by which Congress may accomplish the permissible end of creating a "local" court system under the District Clause, United States v. Jacobs, 306 U.S. 363, 371, 59 S.Ct. 551, 83 L.Ed. 763 (1939); Nebbia v. New York, 291 U.S. 502, 525, 54 S.Ct. 505, 78 L.Ed. 940 (1934); Neild v. District of Columbia, 71 App.D.C. 306, 312, 110 F.2d 246, 252 (1940).

We next consider appellant's historical argument: That in the District of Columbia, Congress, at least since 1863,[13] has conferred jurisdiction over local felonies in article III courts and therefore it cannot *now* be permitted to withdraw that jurisdiction from these courts and vest it in an article I court system.

■ First, it is by no means clear that when Congress vested jurisdiction over *local* felonies in the courts of the District of Columbia, it did so because those cases arose "under the laws of the United States" within the meaning of article III. Of course, these local crimes were violations of laws of the United States, *i. e.,* Acts of Congress, but, were they the types of cases arising under "the Laws of the United States" over which article III directs Congress to vest jurisdiction in inferior *federal* courts? [14] The historical

337 U.S. at 620 n. 14, 69 S.Ct. 1173, 93 L.Ed. 1556 (Rutledge, J., concurring); Neild v. District of Columbia, 71 App. D.C. 306, 310 n. 10, 110 F.2d 246, 250 n. 10 (1940).

11. Contrary to appellant's contention, the author of the majority opinion in Glidden Co. v. Zdanok, *supra*, 370 U.S. at 537, 549, 82 S.Ct. 1459, 8 L.Ed.2d 671 Mr. Justice Harlan, did not ignore or repudiate the holding of the Circuit Court in Lurk v. United States, 111 U.S. App.D.C. 238, 296 F.2d 360 (1961). Justice Harlan's scholarly opinion simply confirms the results of the inquiry which he made of the Solicitor General at the oral argument: That the principle upon which the Circuit Court based its holding would not serve as a single means for deciding both the *Lurk* case involving a D.C. felony and the *Glidden* case involving a New York diversity suit,

370 U.S. at 538, 82 S.Ct. 1459, 8 L.Ed. 2d 671. *See also* 30 U.S.L.W. 3263 (1962).

12. Forty-six state constitutions do not provide for life tenure for trial judges who hear and determine state felony cases, Appellee's Supp.Memo. 9–11.

13. *See* note 7, *supra.*

14. Appellant contends that the "judicial Power of the United States," as defined in article III, must extend to all cases arising under the laws of the United States. We disagree. Quite clearly, judges in the state courts, as well as judges who derive their sole power from article I (*e. g.,* D.C. misdemeanors and cases and controversies before "legislative courts," *see* Burns, Stix Friedman & Co., v. Commissioner, 57 T.C. 392 at 8 (1971)) and article IV (territorial) judges have

record is, for all practical purposes, silent as to the particular constitutional power Congress thought it was exercising when it created the first courts in the District and conferred jurisdiction upon them. We must therefore turn to the *type of jurisdiction* conferred by Congress to determine which article of the Constitution Congress may have relied upon to confer that jurisdiction. *See generally* Ex parte Bakelite Corp., 279 U.S. 438, 459, 49 S.Ct. 411, 73 L.Ed. 789 (1929).

In 1801, Congress created the first District of Columbia felonies when it reenacted for the District of Columbia the laws which had been applicable to those particular areas of Maryland and Virginia ceded to the United States for the District, 2 Stat. 103, 104 (1801); *see* Kendall v. United States, *supra* 37 U.S. at 619, 9 L.Ed. 1181. It seems quite unlikely that Congress intended to transform the offenses committed by the residents of the ceded areas against their local statutes into general federal offenses triable under article III in lower federal courts. To have done so would have been to create a unique form of federal criminal jurisdiction because (i) the conduct proscribed by Congress in the District of Columbia Code, unlike general federal offenses, could have occurred only in one specific geographical area, and (ii) inferior federal courts created under article III to sit throughout the several states have never been capable of exercising article III judicial power over local offenses committed in their respective districts.[15]

It must be remembered that in 1801, there was a distrust of the general federal judicial power. Indeed, this distrust had (a) led to the provision in article III itself that Congress might limit that judicial power almost completely, National Mutual Insurance Co. of District of Columbia v. Tidewater Transfer Co., *supra*, 337 U.S. at 634, 69 S.Ct. 1173, 93 L.Ed. 1556 (Vinson, J., dissenting), and, (b) engendered the notion that judicial power under article III should be expanded only when it could be demonstrated that the particular type of jurisdiction was acutely needed for the purposes of *uniformity* and *national harmony, id.* In sum, we are persuaded that by virtue of the restricted locale of the conduct proscribed by the first District of Columbia Code, the fact that inferior article III courts throughout the several states are incapable of receiving jurisdiction over purely local offenses and the general reluctance in the early days of our nation's history to *expand* the article III judicial power, Congress conveyed the judicial power over District of Columbia felonies to the courts in the District under the *District Clause*. *See generally* National Mutual Insurance Co. of District of Columbia v. Tidewater Transfer Co., *supra;* Pang-Tsu Mow v. Republic of China, *supra;* Keller v. Potomac Electric Power Co., 261 U.S. 428, 43 S.Ct. 445, 67 L.Ed. 731 (1923); Lurk v. United States, *supra.*

---

heard and determined cases *arising under the laws of the United States* since the very earliest days of our history. *See generally* Nat'l Mut. Ins. Co. of District of Columbia v. Tidewater Transfer Co., *supra*, 337 U.S. at 615, 69 S.Ct. 1173, 93 L.Ed. 1556 (Rutledge, J., concurring).

15. In O'Donoghue v. United States, *supra*, Justice Sutherland justified his conclusion that the local supreme court and circuit court of appeals were article III courts primarily because they exercised parallel jurisdiction with the other inferior *federal* courts in the several states. He stated that the exercise of non-federal or administrative and legislative powers by the local courts by virtue of the Dis-

trict Clause should not deprive these courts of their article III status, 289 U.S. 545, 53 S.Ct. 740, 77 L.Ed. 1356. What we infer from the learned Justice's opinion is that the exercise of those powers, which other inferior federal courts cannot exercise (including the power to hear local felonies), must have derived solely from the District Clause. Otherwise, Justice Sutherland surely would have alluded to the jurisdiction over local felonies (which have never been considered as general federal offenses, Gilstrap v. Clemmer, 284 F.2d 804, 808 (4th Cir. 1960)) as yet another reason why the local supreme court and circuit court were created by virtue of article III.

Even if we were to assume that Congress could have vested *under article III* jurisdiction over what were in 1801 purely local felonies in the courts then existing in the District, the plain language of article III would apparently not prevent Congress from removing that jurisdiction.[16] We note that the Supreme Court has recognized that "legislative courts," under certain circumstances, are permitted to hear cases involving the same subject matter as those heard by article III courts. National Mutual Insurance Co. of District of Columbia v. Tidewater Transfer Co., *supra*, 337 U.S. at 600, 602 and 641, 69 S.Ct. 1173, 93 L.Ed. 1556 (Vinson, J., dissenting). *See also* Burns, Stix Friedman & Co., Inc. v. Commissioner, 57 T.C. 392 (1971). Thus, we see no reason why Congress could not have allowed *both* article III *and* article I courts in the District to hear D.C. felonies, or simply have decided (as it has done in enacting the 1970 Court Reform Act) that the article I court system should be the exclusive judicial forum in the District for such cases.

■ Concededly, Congress exercises its exclusive legislative power over the District subject *always* to the guaranties of the Bill of Rights [17] and other specific constitutional provisions. However, appellant has not demonstrated that he has any right emanating from article III to be tried for a *local* felony in the District of Columbia before an *article III* judge with lifetime tenure and undiminishable salary because the power of the United States Government to prohibit his conduct and to prosecute him for it *in an appropriate judicial forum* is not based upon the provisions of that article. What Congress has done by enacting the 1970 Court Reform Act is to treat criminal offenders in the District of Columbia as they would be treated in any state (or as they would have been treated if portions of Maryland and Virginia had never been ceded to the United States for the District of Columbia): If the conduct violates a local statute, a local court has jurisdiction to hear and determine their case; if the conduct violates a general federal statute, an article III federal court will have jurisdiction. We find no constitutional error on the part of Congress in creating the District of Columbia Superior Court and this court to hear and determine "local" crimes.

## II.

We turn now the facts of this case. Appellant contends that the trial court should have excluded from evidence the pistol which he was found guilty of possessing because the police seized it from his automobile in violation of his fourth amendment rights.

Officers Busker and Morrissette of the Special Operations Division of the Metropolitan Police Department were in plain clothes and an unmarked police car parked on "T" Street when appellant drove by in the early evening of January 16, 1971. Officer Busker knew from the Virginia license tags on appellant's car that the vehicle had been rented.[18] They decided to run a so-called "spot check" to determine

16. *See* Nat'l Mut. Ins. Co. of District of Columbia v. Tidewater Transfer Co., *supra* at 600, 607 (Rutledge, J., concurring), 627 (Vinson, J., dissenting), 655, 69 S.Ct. 1173, 93 L.Ed. 1556 (Frankfurter, J., dissenting) ; Lockerty v. Phillips, 319 U.S. 182, 187, 63 S.Ct. 1019, 87 L.Ed. 1339 (1943) ; Sheldon v. Sill, 49 U.S.(8 How.) 441, 12 L.Ed. 1147 (1850) ; United States v. Hudson, 11 U.S.(7 Cranch) 32, 33, 3 L.Ed. 259 (1812) ; Turner v. Bank of North America, 4 U.S.(4 Dall.) 8, 1 L.Ed. 718 (1799).

17. Indeed, many of the provisions of the Bill of Rights were applied directly to cases in the District of Columbia long before they were made applicable to the states through the fourteenth amendment, *see, e. g.,* Neild v. District of Columbia, *supra*, 71 App.D.C. at 310 n. 10, 110 F.2d 246.

18. Officer Busker testified that the numbers on the license tags of rental cars registered in Virginia ran in specified series. This was not contradicted by appellant at trial. (R. 14.)

if the appellant had a proper license and rental agreement (the equivalent of proper registration). Appellant had committed no moving traffic violation and his auto had no apparent equipment defect.

The officers followed appellant's car as it made an acute angle left turn from "T" Street onto Florida Avenue and then proceeded northwest on Florida for a few blocks until the officers waved appellant to a stop near the corner of Florida and Vermont Avenues. Appellant alighted immediately and met Officer Busker near the left rear area of his car, while the other officer proceeded to the right front area of the auto. Officer Busker asked for and received from appellant his driver's license. However, when asked for the rental agreement for the vehicle, appellant entered the car and retrieved it from the glove compartment. The agreement by its terms had expired on the previous Tuesday, January 12th. Appellant explained (and his story was later verified by the car rental agency) that he had modified the agreement orally prior to its expiration and that, although the written agreement did not so indicate, he was in fact entitled to drive the car by reason of the oral extension of his rental period.

During this conversation between Officer Busker and appellant on the left side of the car, Officer Morrissette was glancing at the interior of the vehicle by means of a flashlight.[19] He testified at trial that his presence in that position and his use of the flashlight were standard operating pro-

cedure to protect the safety of the other officer who was endangered by the possibility that the driver, retrieving something from his car, might pull out a weapon and assault the officers. (R. 59.) Officer Morrissette then noticed the trigger mechanism of a pistol protruding out from beneath the armrest on the front of appellant's car. He removed the pistol from appellant's auto and, after learning that it was unregistered, placed appellant under arrest for a violation of D.C.Code 1967, § 22–3204.[20]

The narrow issue posed is whether the officers could properly pull appellant over to the curb and demand his license and registration when (1) they had not seen him violate traffic or vehicular equipment regulations and (2) they had no cause to believe from his actions that he had otherwise engaged or was about to engage in any criminal activity. Appellant argues vigorously that when the officers stopped him by a show of their police authority they had "seized" him within the meaning and protection of the fourth amendment, yet they were not then able, as required by the Supreme Court in Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968), "to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."

In reply, the Government contends that there is a right, indeed, a duty mandated by Congress,[21] on the part of a police offi-

19. Appellant's testimony, which was disbelieved at trial, was that Officer Morrissette began an immediate and thorough search of the interior of the car and the trunk as soon as appellant began conversing with Officer Busker. (R. 11–15.)

20. Appellant alleged at trial that upon finding the weapon in the car after a thorough search of its interior, Officer Morrissette stated, "I told you that a rental car is a good case." (R. 15.) Officer Morrissette denied making such a statement. Under cross-examination, Officer Busker did state that he knew that many rented cars were not returned on

time and that he personally knew of a policeman who stopped a rented car and found about $6,000 worth of narcotics in the vehicle. (R. 27.)

21. D.C.Code 1967, § 40–104(a) provides in pertinent part:

It shall be unlawful—

(1) for any person to operate any *motor vehicle* . . . upon any public highway of the District of Columbia . . . if such motor vehicle . . . is not registered . . . or . . . if such person does not have in his possession or in the motor vehicle . . .

cer to stop an automobile and require the driver to produce his license and the vehicle's registration without the need of first having reasonable suspicion that the driver lacks these particular documents. We believe that the propositions advanced by the parties are not necessarily irreconcilable within the general framework of the stopping of an automobile by police. We conclude that in this case the trial court's denial of appellant's motion to suppress was correct.

■ At the outset, we reject the rigid rule which appellant urges us to adopt: That a police officer may stop an automobile for a spot check of the driver's license and the car's registration *only* when he has articulable suspicion, as defined by *Terry*, that either of such documents is invalid. The touchstone of the fourth amendment is reasonableness. It seems to us in this age of the motor car that when the community's interest in limiting use of its highways to licensed drivers in registered autos is balanced against the momentary interruption of the motorist which is necessary to ascertain whether he is complying with these licensing requirements such intrusion is *not* so unreasonable as to be violative of the fourth amendment.[22]

We must keep in mind that if we were to limit the police, as appellant urges, to stopping *only* those autos in which the driver might reasonably be suspected to be without a license, for example, because of his youthful appearance, the result would unjustifiably single out and discriminate against certain groups of citizens, *i. e.*, the young. Moreover, such a restrictive ruling by us might render virtually unenforceable the Congressional prohibition against *all* unlicensed drivers and unregistered cars driving on District of Columbia streets.[23] After all, persons who drive in the District without a valid license and registration will not necessarily exhibit conduct or the appearance giving rise to articulable suspicion that they are without proper driving credentials. Thus, they would be immune from the "spot check" to enforce a requirement deemed necessary by Congress for public safety on the District's highways.

■ We hasten to add that the courts, including ours, have warned law enforcement officers, specifically and emphatically, that a so-called "spot check" is *not* to be "used as a substitute for a search for evidence of some possible crime unrelated to possession of a driver's permit." Mincy v. District of Columbia, D.C.App., 218 A.

---

operated the registration certificate . . . .
D.C.Code 1967, § 40–301(c) provides:
Any individual to whom has been issued a permit to operate a motor vehicle shall have such permit in his immediate possession at all times when operating a motor vehicle in the District and shall exhibit such permit to any police officer when demand is made therefor. . . .
*See* Mincy v. District of Columbia, D.C. App., 218 A.2d 507 (1966).

22. Mincy v. District of Columbia, *supra* (and the cases cited therein at 218 A.2d at 508 n. 3) ; United States v. Cross, 437 F.2d 385 (5th Cir. 1971) ; Myricks v. United States, 370 F.2d 901 (5th Cir.), cert. dismissed, 386 U.S. 1015, 87 S.Ct. 1366, 18 L.Ed.2d 474 (1967) ; Lipton v. United States, 348 F.2d 591 (9th Cir. 1965) ; United States v. Vanguilder, 297 F.Supp. 71 (Md.1969) ; United States v. Thomas, 289 F.Supp. 364 (S.D.N.Y.

1968) ; People v. Andrews, Colo., 484 P.2d 1207 (1971) ; People v. Goldstein, 60 Misc.2d 745, 304 N.Y.S.2d 106 (1969) ; State v. Valstad, 282 Minn. 301, 165 N. W.2d 19 (1969) ; People v. Washburn, 265 Cal.App.2d 665, 71 Cal.Rptr. 577 (1968) ; People v. Nunn, 264 Cal.App. 2d 919, 70 Cal.Rptr. 869 (1968) ; People v. Harr, 93 Ill.App.2d 146, 235 N.E.2d 1 (1968) ; State v. Kabayama, 98 N.J. Super. 85, 236 A.2d 164 (1967), aff'd, 52 N.J. 507, 246 A.2d 714 (1968).
*Cf.* Brinegar v. United States, 338 U.S. 160, 188, 69 S.Ct. 1302, 93 L.Ed. 1879 (Jackson, J., dissenting), reh. denied, 338 U.S. 839, 70 S.Ct. 31, 94 L.Ed. 513 (1949) ; Bowling v. United States, 122 U.S.App.D.C. 25, 350 F.2d 1002 (1965).

23. Mincy v. District of Columbia, *supra* 218 A.2d at 508; Lipton v. United States, *supra* 348 F.2d at 591; Myricks v. United States, *supra* 370 F.2d at 904; People v. Andrews, *supra*; People v. Nunn, *supra*.

2d 507, 508 (1966), (and the cases cited at 508 n. 3). We say again that when the driver has produced his permit and registration and they are in order he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning. *See generally* Lowe v. United States, 407 F.2d 1391, 1395 (9th Cir. 1969); Reich, Police Questioning of Law Abiding Citizens, 75 Yale L.J. 1161–72 (1966). It is at this precise point that the Supreme Court's explication in *Terry*, with regard to the reasonableness of police conduct in this area of police-citizen contact on the streets, come into play.[24] Once the check for the driver's documents is completed by the officers, they may *not* continue detaining him on the spot unless they *then at that moment* have articulable suspicion that the driver is engaging or has engaged in criminal activity.[25]

We hold in the instant case that the officers had the authority, without observing appellant violate a traffic regulation or otherwise engage in unlawful activity, to stop appellant for the sole purpose of asking him for his driving permit and auto rental agreement. Ordinarily, if he had produced these two documents in proper order the police would have been required to permit him to continue driving on his way without any further questioning. However, once he showed them a rental agreement which had apparently expired, they then had sufficient facts from which they might reasonably infer that he was in unauthorized possession of the car he was driving. Therefore, they were entitled to detain him until the rightful ownership and use of that car could be clarified.

In sum, the officers upon the instant facts and circumstances were properly po-

24. Of course, *Terry* does come into play even before the initial stop if there is evidence that the officer's *original* reason in stopping the vehicle was to investigate some criminal behavior unrelated to the possession of a valid license and valid registration. A significant body of case law has developed the proposition that an officer may detain the driver of a vehicle upon less than probable cause if he has articulable suspicion that the person detained is presently engaged in or about to engage in or has just engaged in criminal activity. *See* United States v. Nicholas, 448 F.2d 622, 626 (8th Cir. 1971); United States v. Madril, 445 F.2d 827, 828 (9th Cir. 1971); United States v. Johnson, 143 U.S.App.D.C. 215, 219–220, 442 F.2d 1239, 1243–1244 (1971); United States v. Turner, 442 F.2d 1146, 1148 (8th Cir. 1971); United States v. Harflinger, 436 F.2d 928, 932 (8th Cir. 1970), cert. denied, 402 U.S. 973, 91 S.Ct. 1660, 29 L.Ed.2d 137 (1971); Young v. United States, 140 U.S.App.D.C. 333, 336, 435 F.2d 405, 408 (1970); United States v. Leyva-Barragan, 423 F.2d 669, 670 (9th Cir. 1970); Riccardi v. Perini, 417 F.2d 645, 647 (6th Cir. 1969); Bowling v. United States, *supra*; United States v. McIntyre, 304 F.Supp. 1244 (E.D.La.1969); United States v. Gazaway, 297 F.Supp. 67, 69–70 (N.D.Ga.1969); State v. Dell, 258 La. 1024, 249 So.2d 118 (1971); Gustafson v. State, 243 So.2d 615, 619–620 (Fla.Dist.Ct.App.1971); State v. Smithers, 269 N.E.2d 874, 877–878 (Ind. 1971); State v. Woodford, 26 Ohio Misc. 51, 55–56, 269 N.E.2d 143, 147 (1971); Stone v. People, Colo., 485 P.2d 495–498 (1971); State v. Ferguson, 3 Wash.App. 898, 479 P.2d 114 (1971); State v. Goudy, 52 Haw. 497, 479 P.2d 800 (1971); United States v. Frye, D.C.App., 271 A.2d 788, 790 (1970); State v. Hilliard, 81 N.M. 407, 467 P.2d 733 (1970); People v. Nickles, 9 Cal.App.3d 986, 88 Cal.Rptr. 763 (1970); State v. Sedillo, 81 N.M. 47, 462 P.2d 632 (1969); Sarabia v. State, 455 S.W.2d 231, 234 (Tex.Cr.App. 1969) (Onion, J., dissenting); State v. Lewis, 80 N.M. 274, 454 P.2d 360 (1969); People v. Villafuerte, 275 Cal.App.2d 531, 80 Cal.Rptr. 279 (1969); People v. Miezio, 103 Ill.App.2d 398, 242 N.E.2d 795 (1968); People v. Tassone, 41 Ill.2d 7, 241 N.E.2d 419, 421 (1968), cert. denied, 394 U.S. 965, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969); People v. Harr, *supra*.

25. Quite obviously at this point the "stop" has passed beyond the point of a minor intrusion for a public health and safety purpose (*i. e.*, the license and registration "spot check") and has passed into the realm of an investigation and interrogation focusing on a particular individual whose conduct in a motor vehicle reasonably suggests *either* a particular license or registration infraction *or* the commission of an unrelated criminal offense.

sition alongside the car at the moment one of them saw the pistol in plain view and seized it. Accordingly, there is no violation of the fourth amendment and the trial court correctly admitted the pistol into evidence against appellant at trial. *See* Harris v. United States, 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968); Wise v. United States, D.C.App., 277 A.2d 476 (1971); United States v. Johnson, 143 U.S.App.D.C. 215, 442 F.2d 1239 (1971).

### III.

■ Appellant's final contention is that the Government violated his fifth amendment right to equal protection of law by prosecuting him for having the pistol under the "felony-repeater" clause of D.C. Code 1967, § 22–3204[26] rather than under the "first offender-misdemeanor" clause of D.C.Code 1967, § 22–3203(2).[27] He argues that since these two statutes prescribe different punishments for the identical conduct, to wit, possessing a pistol after having been convicted of a felony, his right to equal protection was denied when one rather than the other was chosen by the Government. *See* Berra v. United States, 351 U.S. 131, 139, 76 S.Ct. 685, 100 L.Ed. 1013 (1956) (Black, J., dissenting); Olsen v. Delmore, 48 Wash.2d 545, 295 P.2d 324 (1956); State v. Pirkey, 203 Or. 697, 281 P.2d 698 (1955).[28] We disagree.

First, the two statutes in question do *not* proscribe the identical conduct. On the one hand, Section 22–3203(2) makes it a misdemeanor for any *felon* to own or keep a pistol under his control *anywhere* and then goes on to provide a greatly increased

---

26. D.C.Code 1967, § 22–3204 provides in pertinent part:

No person shall within the District of Columbia carry either openly or concealed on or about his person, except in his dwelling house or place of business or on other land possessed by him, a pistol, without a license therefor issued as hereinafter provided, or any deadly or dangerous weapon capable of being so concealed. Whoever violates this section shall be punished as provided in section 22–3215 [fine of not more than $1,000 or imprisonment for not more than one year, or both], *unless the violation occurs after he has been convicted in the District of Columbia of a violation of this section or of a felony*, either in the District of Columbia or in another jurisdiction, in which case he shall be sentenced to imprisonment for not more than ten years. (Emphasis added.)

27. D.C.Code 1967, § 22–3203 provides in pertinent part:

No person shall own or keep a pistol, or have a pistol in his possession or under his control, within the District of Columbia, if—

. . . . .

(2) he has been convicted in the District of Columbia or elsewhere of a felony.

. . . . .

. . . Whoever violates this section shall be punished as provided in section 22–3215 [fine of not more than

$1,000 or imprisonment for not more than one year, or both], unless the violation occurs after he has been convicted of a violation of *this section*, in which case he shall be imprisoned for not more than ten years. (Emphasis added.)

28. *See also* Dixon v. District of Columbia, 129 U.S.App.D.C. 341, 394 F.2d 966 (1968); Hamilton Nat'l Bank v. District of Columbia, 85 U.S.App.D.C. 109, 176 F.2d 624, cert. denied, 338 U.S. 891, 70 S.Ct. 241, 94 L.Ed. 547 (1949); People v. Utica Daws Drug Co., 16 A.D.2d 12, 225 N.Y.S.2d 128 (1962), where equal protection was violated because irrational distinctions were made by the executive branch of the Government between persons whose conduct was identical within the meaning of the applicable statutes.

From the standpoint of constitutional theory, unequal punishment for the identical conduct may be considered as violative of *due process* (unconstitutional vagueness with regard to the applicable penalty for specified conduct) as well as equal protection (unconstitutional lack of reasonable classification with regard to penalties for offenders guilty of the identical conduct). Since appellant phrases his argument in terms of equal protection, our analysis in the instant case is also in those terms, although our conclusion would be the same if we were to consider his argument upon due process grounds.

penalty if the defendant has previously violated that said section. On the other hand, Section 22–3204 makes it a *misdemeanor* for *anyone* (not simply a felon) to possess on his person, except in his *dwelling house* or on other *land* possessed by him, an *unlicensed* pistol capable of being concealed. A defendant under this statute who has a prior felony conviction may receive up to ten years imprisonment for even a first violation. The prior felony conviction referred to in § 22–3204, unlike the felony provision in § 22–3203(2), is *not* an element of the offense. Jackson v. United States, 95 U.S.App.D.C. 328, 221 F. 2d 883 (1955).

■■■ Even if we were to *assume* that both Sections 22–3203(2) and 22–3204 were proscribing certain conduct *by felons,* these two statutes prohibit *differing* kinds of conduct. A felon possessing a pistol in his own home or on other land possessed by him would *not* violate the ban contained in Section 22–3204 against carrying a concealed weapon but would violate only the misdemeanor clause of Section 22–3203(2). In other words, the Government in order to prosecute a felon under the "felony-repeater" clause of Section 22–3204, must not only prove that the defendant was a felon who possessed or controlled a gun (the elements of the § 22–3203(2) misdemeanor), but, in addition, that the felon had an unlicensed pistol on his person while not in his dwelling or on other land owned by him. *See generally* Sansone v. United States, 380 U.S. 343, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1968); United States v. Coppola, 296 F. Supp. 903, 300 F.Supp. 932 (Conn.), aff'd, 425 F.2d 660 (2d Cir. 1969).

■■■ Equal protection would be denied only if the violation of the misdemeanor clause of § 22–3203(2) invariably constituted a violation of the "felony-repeater" clause of § 22–3204, *see* United States v. Coppola, 425 F.2d at 661 (2d Cir. 1969). Furthermore, we are not dealing with two statutes which are even "functionally equivalent,"[29] because violations of §§ 22–3203(2) and 22–3204 are not susceptible to the identical proof. In sum, the situation presented by the statutes in this case is not at all uncommon:[30] Appellant's status as a felon who possessed an unlicensed pistol while not in his dwelling or on his land constituted an act that violated two different criminal statutes. Simply because the Government could have proven a violation by appellant of both §§ 22–3203(2) and 22–3204 and happened to choose § 22–3204 does not violate appellant's right to equal protection, Newman v. United States, 127 U.S.App.D.C. 263, 382 F.2d 479 (1967); United States v. Coppola, *supra.*

In addition, the fact that appellant *could* have been charged solely with a "first offender-misdemeanor" violation of § 22–3203(2) does not *entitle him* to be so charged, Hutcherson v. United States, 120 U.S.App.D.C. 274, 277, 345 F.2d 964, 967, cert denied, 382 U.S. 894, 86 S.Ct. 188, 15 L.Ed.2d 151 (1965), since the prosecutor has authority to decide which charge to bring, including a determination on whether to charge appellant under the felony-repeater provisions of these statutes. Newman v. United States, *supra;* Hutcherson v. United States, *supra;* Martin v. United States, D.C.App., 283 A.2d 448 (1971); United States v. Shaw, D.C.App., 226 A.2d 366, 368 (1967).

The judgment must be and is

Affirmed.

---

29. In Hutcherson v. United States, 120 U.S.App.D.C. 274, 279, 345 F.2d 964, 969, cert. denied, 382 U.S. 894, 86 S.Ct. 188, 15 L.Ed.2d 151 (1965), the concurring opinion written by the now Mr. Chief Justice Burger referred to three different narcotics statutes which were "functionally equivalent" because unex- plained possesion of the drugs was sufficient to constitute a violation of each statute.

30. *E. g.,* a defendant may violate a larceny statute when he commits armed robbery.