## Richmond

GARY LEE SIMMONS

v.

COMMONWEALTH OF VIRGINIA

No. 1356-86-2

Decided June 21, 1988

COUNSEL

Linda L. Johnson (Binford, Johnson & Cloninger, on brief), for appellant.

Marla Lynn Graff, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

COLE, J. — The appellant, Gary Lee Simmons, was convicted in a bench trial of operating a motor vehicle under the influence of alcohol in violation of Code § 18.2-266. Simmons contends that the initial stop of his motor vehicle at a roadblock by a state trooper violated his fourth amendment rights against unreasonable searches and seizures and consequently that all evidence secured as a result of the stop should have been suppressed. We hold that no fourth amendment violation occurred and affirm the conviction.

I.

On July 10, 1986, Troopers Morton and Crowder of the Virginia State Police established a checking detail on Route 601 and Route 776 in Dinwiddie County to inspect drivers' licenses and to check for equipment violations. They placed flags at each end of the checkpoint to warn motorists. The troopers had one

state police car and two state park police cars at the checkpoint. They conducted the checking detail during daylight hours, and according to the testimony of the officers, followed "normal procedure" in stopping all vehicles.

Simmons, who was driving a pickup truck, stopped where Trooper Crowder was checking vehicles. Crowder observed that Simmons' eyes were "very red," and he detected a "strong odor of alcohol" on Simmons' person. Simmons admitted to drinking five beers. Crowder requested Simmons to pull his truck over to the side of the road and step out of the vehicle. Simmons complied. The trooper then administered a variety of field sobriety tests. Upon Simmons' failure to successfully perform the field sobriety tests, he was arrested for driving under the influence of alcohol. Crowder advised Simmons of the implied consent law and administered a breath test. Simmons' blood alcohol content was .11 percent.

At trial, the Commonwealth called Trooper Crowder as its only witness. After he testified briefly about the checking detail, the arrival of Simmons at the checkpoint, and the taking of the breath test, the Commonwealth attempted to introduce in evidence the results of the test. Defense counsel stated: "I have no objection to it coming in at that [sic] point in time, subject to my cross-examination of the trooper." Neither the court nor the Commonwealth's attorney objected to this condition. Accordingly, defense counsel cross-examined the trooper about the facts and circumstances of the checkpoint. At this point, defense counsel learned that the troopers had not been specifically directed to establish the checkpoint.

After the Commonwealth rested its case, the court took up the question of the admissibility of the breath test result. Counsel for the defendant argued that the stop pursuant to the checking detail was impermissible because it did not comply with the criteria established for roadblocks in *Lowe v. Commonwealth*, 230 Va. 346, 337 S.E.2d 273 (1985), *cert. denied*, 475 U.S. 1084 (1986). The Commonwealth's attorney argued the contrary position. The court took the issue under advisement. No objection was voiced as to this procedure. The court then heard the evidence of the defendant. Later in the day, the trial court overruled the defendant's motion to suppress the evidence obtained from the stop, holding that since all traffic was stopped and checked, the seizure did not

violate his fourth amendment rights. The court subsequently found the defendant guilty of driving under the influence of alcohol. On appeal, Simmons maintains that the checkpoint did not comply with *Lowe* and therefore his conviction must be reversed.

## II.

The Commonwealth first contends that we should dismiss this appeal because Simmons did not make a timely objection concerning a violation of his fourth amendment rights. It argues that challenges to admissibility of evidence, to be timely, must be raised prior to trial or when the evidence is introduced, and because the challenge to admissibility was not timely made, the objection must be deemed waived in this case, citing as authority *Woodson v. Commonwealth*, 211 Va. 285, 288-89, 176 S.E.2d 818, 821 (1970), *cert. denied*, 401 U.S. 959 (1971); and *Poole v. Commonwealth*, 211 Va. 258, 259-60, 176 S.E.2d 821, 822-23 (1970).

Rule 3A:9(b)(2) of the Rules of the Virginia Supreme Court,[1] in effect at the time of Simmons' trial, provides, in pertinent part:

In addition to the defenses and objections specified in subparagraph (b)(1) of this Rule, any defense or objection that is capable of determination without the trial of the general issue may be raised by motion before trial. Failure to present any such defense or objection before the jury returns a verdict or the court finds the defendant guilty shall constitute a

---

[1] This rule has been amended by passage of Code § 19.2-399, effective January 1, 1988. In pertinent part, it reads:

Defense motions or objections seeking (i) suppression of evidence on the grounds such evidence was obtained in violation of the provisions of the Fourth, Fifth or Sixth Amendments to the Constitution of the United States or Article I, Section 8, 10 or 11 of the Constitution of Virginia proscribing illegal searches and seizures and protecting rights against self-incrimination, or (ii) dismissal of a warrant, information, or indictment or any count or charge thereof on the ground that a statute upon which it was based is unconstitutional shall be raised by motion or objection, in writing, before trial. The motions or objections shall be filed and notice given to opposing counsel not later than seven days before trial. A hearing on all such motions or objections shall be held not later than three days prior to trial, unless such period is waived by the accused, as set by the trial judge. The court may, however, for good cause shown and in the interest of justice, permit the motions or objections to be raised at a later time.

waiver thereof.

■ Rule 3A:9(b)(2) states that defenses and objections that can be determined without trial of the general issue *may be* raised by motion before trial. In practice, the usual procedure is to raise and determine such issues by a motion *in limine* prior to trial or on the day of trial. The rule, however, is permissive and does not preclude counsel from raising defenses and objections any time before the jury returns a verdict or the court finds the defendant guilty. R. Bacigal, *Virginia Criminal Procedure* § 14-1 (1983). Although the rule provides that no waiver of rights occurs if an objection is made up to the time the jury returns a verdict or the court finds the defendant guilty, a party does not have an absolute right to object at any time.

■ A number of well established principles regulate the conduct of a trial, and we find that Rule 3A:9(b)(2) does not alter them. "The conduct of a trial is committed to the sound discretion of the trial court." *Cunningham v. Commonwealth*, 2 Va. App. 358, 365, 344 S.E.2d 389, 393 (1986) (citing *Justus v. Commonwealth*, 222 Va. 667, 676, 283 S.E.2d 905, 910 (1981), *cert. denied*, 445 U.S. 983 (1982)). Unless an objection is stated with reasonable certainty at the time of the ruling, neither the Supreme Court nor the Court of Appeals will consider the question for the first time on appeal. Rules 5:25 and 5A:18. "The purpose of th[is] rule is to give the trial court an opportunity to rule intelligently and to avoid unnecessary appeals, reversals, and mistrials." *Marshall v. Goughnour*, 221 Va. 265, 269, 269 S.E.2d 801, 804 (1980).

■ A general objection is insufficient.

It is the duty of a party, as a rule, when he objects to evidence, to state the grounds of his objection, so that the trial judge may understand the precise question or questions he is called upon to decide. The judge is not required to search for objections which counsel have not discovered, or which they are not willing to disclose. It is also due to the party whose evidence is objected to, that the grounds of objection should be specified, so that he may have an opportunity to remedy the defect pointed out, if possible, and have

the case tried upon its merits.

*Jackson v. Chesapeake & Ohio Ry. Co.*, 179 Va. 642, 651, 20 S.E.2d 489, 492-93 (1942) (quoting *Warren v. Warren*, 93 Va. 73, 74, 24 S.E. 913, 914 (1896)). "In order to be considered on appeal, an objection must be timely made and the grounds stated with specificity." *Marlowe v. Commonwealth*, 2 Va. App. 619, 621, 347 S.E.2d 167, 168 (1986). "To be timely, an objection must be made when the occasion arises — at the time the evidence is offered or the statement made." *Id.*

In some cases the inadmissibility and objectionable nature of the evidence will not be immediately obvious to counsel. In such circumstances, we have said that the objection will be timely if objection is "made as soon as the dangerous drift of the examination becomes apparent." *Weimer v. Commonwealth*, 5 Va. App. 47, 57, 360 S.E.2d 381, 386 (1987) (citations omitted).

In applying these well established principles to the facts of this case, we hold that the objection was timely made. Where the issue is a violation of constitutional rights, difficulty exists in determining precisely when the violation manifests itself and when the objection must be made. In this case, the objection was made when the Commonwealth offered the result of the breath test in evidence as its first exhibit. It was admitted in evidence subject to defense counsel's cross-examination of the trooper. The Commonwealth made no objection to this procedure. After the cross-examination was completed and all of the facts concerning the stop were known, counsel for both parties made their arguments and the trial court took the question under advisement. Under these circumstances, we hold that the fourth amendment objection was timely made and that the fourth amendment issue is properly before us.

### III.

Simmons contends that the stop of his car pursuant to the roadblock violated his right to be free from unreasonable searches and seizures guaranteed to him under the fourth amendment and article I, § 10 of the Virginia Constitution.[2] Simmons argues that the

---

[2] The protections under the Virginia Constitution are substantially the same as those contained in the fourth amendment. *Lowe*, 230 Va. at 348 n.1, 337 S.E.2d at 275 n.1.

stop in this case was not pursuant to a plan "embodying explicit, neutral limitations on the conduct of individual officers," *Brown v. Texas*, 443 U.S. 47, 51 (1979), as required in *Delaware v. Prouse*, 440 U.S. 648, 663 (1979).

In *Prouse*, an officer made a random stop of the respondent's car to check his driver's license and car registration. The officer had observed neither traffic nor equipment violations. Upon stopping the car, he saw marijuana on the floor board in plain view and arrested the respondent for drug possession. *Id.* at 650. The respondent maintained that the random stop of his vehicle was violative of the fourth amendment, and the Supreme Court agreed, holding:

> [E]xcept in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment.

*Id.* at 663.

The Court indicated, however, that not all stops on less than "articulable and reasonable suspicion" were unconstitutional:

> This holding does not preclude the . . . States from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic at roadblock-type stops is one possible alternative. We hold only that persons in automobiles on public roadways may not for that reason alone have their travel and privacy interfered with at the unbridled discretion of police officers.

*Id.*

Then, in *Brown*, 443 U.S. at 50-51, the Court further explained the circumstances justifying a stop on less than probable cause or "articulable and reasonable suspicion:"

---

Thus, if the checkpoint survives fourth amendment scrutiny, it is constitutional under article I, § 10 of the Constitution of Virginia.

The reasonableness of seizures that are less intrusive than a traditional arrest depends "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." Consideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.

A central concern in balancing these competing considerations in a variety of settings has been to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field. To this end, the Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers.

(citations omitted).

Since *Prouse*, the Virginia Supreme Court has addressed the constitutionality of a DUI roadblock under the fourth amendment. In *Lowe*, the defendant was stopped by Charlottesville city police at a roadblock established pursuant to a plan to check drivers' sobriety and thereby reduce drunk driving. When Lowe was stopped at the roadblock, the officers determined that he was under the influence of intoxicants and arrested him for drunk driving. 230 Va. at 348, 337 S.E.2d at 274. Lowe contended that his fourth amendment rights were infringed when he was stopped at the roadblock.

In *Lowe*, the Virginia Supreme Court balanced the "State's strong interest in protecting the public from the grave risk presented by drunk drivers, against the minimal inconvenience caused motorists approaching the roadblock" and held that the action of the police did not violate Lowe's fourth amendment rights. The court concluded that, under the factual situation presented, the Charlottesville system was "safe and objective," employed "neutral criteria," and did not involve "standardless, unbridled discretion by the police officer in the field, which was condemned in *Prouse*." *Id.* at 352, 337 S.E.2d at 277. The plan,

recommended by representatives of the Virginia Alcohol Safety Program in conjunction with the federal Department of Transportation, was adopted after careful study and consideration of, among other things, the law on the subject, the safety of the police and motorists, and locations within the city where there had been drunk driving arrests and alcohol related accidents. *Id.* at 351, 337 S.E.2d at 276. Outside experts trained the police officers and prepared an operational manual. The program received extensive publicity. *Id.* at 351-52, 337 S.E.2d at 276-77. Five uniformed police officers, wearing reflector vests, were assigned to the scene. The officers at the checkpoint had no discretion regarding which vehicles to stop: every southbound vehicle was stopped. *Id.* at 352, 337 S.E.2d at 277.

Simmons attempts to distinguish his situation from that in *Lowe* because (1) no written manuals or directives were issued to. the officers telling them where to set up the roadblock, what cars to stop, or what questions to ask the drivers; (2) no procedures were established for safety of the motorists or the officers; (3) no plan was established in the event of a traffic backup; and (4) no guidelines were set concerning the length of the actual stop. However, *Lowe* does not suggest that the procedure used in the Charlottesville roadblock represented the minimum guidelines for all roadblocks throughout the state. Instead, we read *Lowe* to hold that the roadblock established under the Charlottesville system under all of the conditions present, did not violate the fourth amendment. *Lowe* was decided upon the facts and circumstances existing at the particular roadblock in question, and is distinguishable from the facts of this case. Therefore, we must analyze the facts peculiar to the checkpoint in this case to determine whether the checkpoint violated the fourth amendment.

In determining the constitutionality of the checkpoint in this case, we must weigh "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Brown*, 443 U.S. at 50-51. First, we find that the State of Virginia has a substantial interest in protecting its motorists, passengers and pedestrians from unsafe drivers and vehicles.[3] Indeed,

---

[3] To this end, the General Assembly has enacted much legislation. *See, e.g.*, Code § 46.1-8 (uniformed officer has right to inspect motor vehicles); Code § 46.1-41 (motor vehicle owner must register vehicle before operating); Code § 46.1-64 (illegal to operate

the United States Supreme Court so found in *Prouse*: "[T]he States have a vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles, that these vehicles are fit for safe operation, and hence that licensing, registration, and vehicle inspection requirements are being observed." *Prouse*, 440 U.S. at 658. Likewise, we find that the stopping of all vehicles at a fixed checkpoint advances this public interest. As one court has put it:

> If stopping motorists . . . for the good faith purpose of inspecting or asking for the exhibition of a driver's license were not permitted, the licensing law would break down and become a nullity, and the objective of promoting public safety from irresponsible automobile drivers would be seriously impeded. There would be but few occasions where an officer could otherwise learn that the law was being violated.

*Commonwealth v. Mitchell*, 355 S.W.2d 686, 688-89 (Ky. 1962); *see also Palmore v. United States*, 290 A.2d 573, 582 (D.C. 1972), *aff'd*, 411 U.S. 389 (1973); *State v. Holmberg*, 194 Neb. 337, 340, 231 N.W.2d 672, 675 (1975). The Supreme Court stated in *Prouse* that because unlicensed drivers are presumably less safe drivers who are more likely to commit traffic violations, most unlicensed drivers will eventually be discovered without the necessity of spot checks. We refuse, however, to require law enforcement officials to wait until after an actual traffic violation has occurred before they can check for license, registration and equipment violations.

Second, we find that the severity of the interference with individual liberty is slight in this case. In determining the severity of the interference with individual liberty, we must look at both the objective and subjective aspects of the intrusion. The objective aspect refers to the physical intrusion and is measured by factors such as the length of the stop, the nature of the questioning, and whether a search is conducted. *See United States v. Martinez-Fuerte*, 428 U.S. 543, 558 (1976). The subjective aspect refers to the psychological intrusion and is measured by factors such as ad-

---

unregistered motor vehicle); Code § 46.1-167.3 (illegal to operate uninsured motor vehicle); Code § 46.1-349 (illegal to drive without a driver's license); Code § 46.1-350 (illegal to drive while license suspended or revoked).

equate warning of the official nature and purpose of the stop and whether motorists are being stopped in a systematic, nonrandom fashion. *Id.* at 558-59. In this case, both the objective and subjective intrusions were minimal. Objectively, each motorist was stopped for only a few seconds — the length of time required for him or her to produce a driver's license and registration — and no search of vehicles or their occupants occurred. Subjectively, the checkpoint was clearly marked, the check was conducted during daylight hours by uniformed officers, and every vehicle was stopped. Indeed, the Supreme Court has indicated that a stop at a checkpoint involves a lesser subjective intrusion than that occasioned by a roving patrol stop or random spot check. *Id.*

In *Martinez-Fuerte*, 428 U.S. at 558, the Court held: "[W]e view checkpoint stops in a different light [than roving patrol stops] because the subjective intrusion — the generating of concern or even fright on the part of lawful travelers — is appreciably less in the case of a checkpoint stop." Likewise, in *Prouse*, 440 U.S. at 657 (quoting *United States v. Ortiz*, 422 U.S. 891, 894-95 (1975)), the Court said:

> For Fourth Amendment purposes, we also see insufficient resemblance between sporadic and random stops of individual vehicles making their way through city traffic and those stops occasioned by roadblocks where all vehicles are brought to a halt or to a near halt, and all are subjected to a show of the police power of the community. "At traffic checkpoints the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion."

Finally, in balancing these competing considerations, "an individual's reasonable expectation of privacy [must not be] subject to arbitrary invasions solely at the unfettered discretion of officers in the field." *Brown*, 443 U.S. at 51. Consequently, for the seizure to be reasonable, it must be based on "specific, objective facts" or it "must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of the officers." *Id.*

Clearly, the officers in this case had no reasonable and articulable suspicion to stop Simmons. The reasonableness of the stop, therefore, turns on whether it was carried out pursuant to a "plan

embodying explicit, neutral limitations on the conduct of the officers." We find that it was. The evidence in the record discloses that the state troopers stopped *all* vehicles according to the normal procedure required by the state police. In *Prouse*, 440 U.S. at 663, the Supreme Court suggested that state-developed methods of spot checks, such as "[q]uestioning of all oncoming traffic at roadblock-type stops," do not involve "the unconstrained exercise of discretion." Therefore, it is of no consequence that the officers in this case were not specifically directed to establish the checkpoint at that particular place and time.

Having weighed all the factors and considerations set forth in *Brown*, we conclude that the stop, i.e., the roadblock, was reasonable. No unconstrained or unbridled discretion was involved in stopping motorists. The checking detail was conducted during daylight hours, every vehicle was stopped, and motorists were detained only briefly. The checkpoint was marked by appropriate warnings and three police vehicles and two uniformed officers were present to indicate the presence of governmental authority. Therefore, none of the evils of random stops condemned in *Prouse* were present in this instance.

Accordingly, we affirm the defendant's conviction.

*Affirmed.*

Duff, J., concurred.

Benton, J., concurring and dissenting.

I concur only in Part II of the majority opinion which determines that, when he objected at trial to the admission of evidence obtained from him as he was seized at a highway checkpoint, Gary Lee Simmons properly preserved for appeal the question of the fourth amendment violation. I dissent from the remainder of the opinion because I conclude that the checkpoint was established and operated in violation of the constitutional prohibition against "unreasonable searches and seizures." U.S. Const. amend. IV.

"[S]topping [a motor vehicle] and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth and Fourteenth] Amendments [to the United States Constitution], even though the purpose of the stop is limited and the resulting deten-

tion quite brief." *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *see also Brown v. Texas*, 443 U.S. 47, 50 (1979). Thus, when a citizen, driving a motor vehicle, is stopped by a law enforcement officer, the issue to be decided is the same as when an individual is otherwise detained by a law enforcement officer in any other setting — whether the seizure was constitutionally reasonable. "[T]he Fourth Amendment requires that [the] seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." *Brown*, 443 U.S. at 51; *see also Prouse*, 440 U.S. at 663; *United States v. Martinez-Fuerte*, 428 U.S. 543, 558-62 (1976); *Lowe v. Commonwealth*, 230 Va. 346, 350, 337 S.E.2d 273, 275-76 (1985), *cert. denied*, 475 U.S. 1084 (1986).

Simmons was not stopped by the officers because of specific, objective facts which gave rise to particularized, articulable suspicion "that a crime had been, was being, or was about to be committed." *Lowe*, 230 Va. at 350, 337 S.E.2d at 276; *see Zimmerman v. Commonwealth*, 234 Va. 609, 612, 363 S.E.2d 708, 709 (1988). Therefore, we must decide whether the checkpoint where the officers stopped Simmons was operated "pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." *Brown*, 443 U.S. at 51. Because this record does not establish that fact, I respectfully disagree with the majority's conclusion that the seizure of Simmons was not violative of the fourth amendment.

The Commonwealth did not discharge its burden of proving the constitutional reasonableness of the warrantless seizure under the fourth amendment. *See Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971); *Vale v. Louisiana*, 399 U.S. 30, 34 (1970). The evidence established that at approximately 8 p.m. on Thursday, July 10, 1986, Officers Crowder and Morton of the Virginia State Police set up a "checking detail on Route 601 and Route 776" without having been directed by a supervisor to do so. Crowder testified that the purpose of his checkpoint was to check for "driver's license and equipment violations." Although Crowder testified that he made the decision to set up the checkpoint and determined its location, the record does not reflect his reason for choosing this particular site. Crowder also testified that although

he had discretion as to which vehicles to stop, "normal procedure is to stop all vehicles." He said that they "stopped all vehicles" at the checkpoint.

Crowder and Morton were assisted at the checkpoint by state park police. The record does not reflect the number of state park police that assisted; however, it is reasonable to assume that at least two state park police were present since two state park police cars were present at the checkpoint. The record contains no further details concerning the activities of the state park police.

At approximately 8:40 p.m. Simmons approached the checkpoint in his truck, pulling a boat on a trailer. He and his passenger, Steve Harris, had been fishing in nearby Lake Chesdin. Crowder could not recall whether the blue lights on the police vehicles were activated to warn drivers of the checkpoint, but he did recall that two flags were placed at the checkpoint. Crowder did not notice anything erratic about the manner in which Simmons was operating his truck, and, prior to the stop, Crowder did not have reason to suspect that Simmons was intoxicated or unlicensed. Crowder described his encounter with Simmons as follows:

His eyes were very red, strong odor of alcohol on his person. And he pulled up to where I was standing. He told me that he had been fishing. I asked him how much had he had to drink. He said about five beers. I had him pull his truck over and asked him out. He had no shirt on and no shoes at the time. I asked him what time it was without looking at the watch. He was about 20 minutes off. I had him stand still with his eyes shut and head tilted backwards. He swayed back and forth. I had him stand on one leg and count to ten. He did keep his leg up, but he swayed and jumped around just a little bit. I had him touch his nose with his index finger with his eyes shut. With his right finger he did okay. I offered him a alcosensor test at this time. I advised him that he was under arrest for driving under the influence. I advised him of the Virginia implied consent law. He took a breath test.

The breath test indicated his blood alcohol content was .11 percent by weight by volume.

In *Lowe*, our Supreme Court approved a checkpoint that "is safe and objective in its operation, employs neutral criteria, and does not involve standardless, unbridled discretion by the police officer in the field." 230 Va. at 352, 337 S.E.2d at 277. The decision in *Lowe* was based upon evidence in that record which established the details of the plan under which the City of Charlottesville Police operated its checkpoint. Although the specific location of the Charlottesville roadblock was not publicized, the DUI roadblock project was extensively publicized. In addition, the *Lowe* record established that the plan included:

criteria for selection of a particular area for designation as a checkpoint site; provisions that a high-ranking police officer make the daily assignment of a previously designated site for operation of a roadblock and that such officer assign the personnel to work a particular roadblock; specific provisions for the manner in which a roadblock site should be manned and equipped; and detailed routine for bringing traffic to a stop, interviewing motorists, and evaluation of an operator suspected of driving under the influence.

*Id.* at 351, 337 S.E.2d at 277. Furthermore, the record in *Lowe* established that "[t]he officers at the checkpoint had no discretion regarding which vehicles to stop," and the record also established the manner in which the checkpoint was operated to accomplish the goals of the project. *Id.* at 352, 337 S.E.2d at 277.

Every factor that the Court cited as evidence that the *Lowe* roadblock was "safe and objective in its operation, employ[ed] neutral criteria, and [did] not involve standardless, unbridled discretion by the police officer in the field" is lacking in the present case. The record of this case establishes that no supervisor or high ranking officer made the decision to institute the checkpoint or determine the situs of the checkpoint. Those decisions were made entirely at the discretion of Crowder, the officer in the field. No provisions were made for the manner in which the checkpoint site should be manned and equipped, and no provisions were made for a detailed routine for bringing traffic to a stop, interviewing motorists, evaluating suspected violators, and specifying which equipment was to be checked for violations. Also no evidence establishes that the checkpoint was operated in a manner to accomplish the stated goals of the project. Although Crowder testified that

the checkpoint was operated according to "normal procedures," no testimonial or documentary explanation was presented to establish what constitutes "normal procedures."

The majority, while recognizing that the principles of law stated in *Lowe* are valid, states that *Lowe* "was decided upon the facts and circumstances existing at [that] particular roadblock . . . and is distinguishable from the facts of this case." The majority further states that we must, therefore, "analyze the facts particular to the checkpoint in this case to determine whether the checkpoint violated the fourth amendment." While I agree that the facts and circumstances of the present case are distinguishable from the facts and circumstances of *Lowe*, I believe that the import of the stark contrast in the degree of limitation placed on the officers' discretion in the two cases is indicative that the checkpoint in the present case violated minimum constitutional standards.

There is not a scintilla of evidence that the checkpoint in this case was established pursuant to a "plan embodying explicit, neutral limitations on the conduct of individual officers." *Brown*, 443 U.S. at 51. We only know that Crowder used what he considered to be "normal procedures" and that "every car was stopped." Thus, the only support for the Commonwealth's claim of constitutionality of the stop in this case is reliance upon dicta in *Prouse* to give unwarranted significance to Crowder's testimony that every car was stopped. This testimony, however, does not end the inquiry into whether explicit, neutral limitations were placed on Crowder's conduct.

Crowder admitted that he could exercise his discretion in the operation of the checking detail. Thus, his testimony that he operated the checkpoint according to "normal procedure" does not establish that the discretion within which he was operating was sufficiently checked. The record contains no evidence upon which the trial court could have reviewed or this Court can review the "normal procedures" pursuant to which Crowder said this checkpoint was established and operated. Moreover, the record contains no evidence showing that the park police were aware of or were operating under the "normal procedures" as Crowder understood them. The record does not reflect whether any limit was placed upon the extent of the intrusion by the officers at the checkpoint; whether all drivers were questioned; whether all drivers were required to exit their vehicle; or whether the park police were check-

ing for fish and game violations.

In addition to the failure to establish on this record the specifics of a plan, perhaps the factor most indicative of the absence, in fact, of "a plan embodying explicit, neutral limitations on the conduct of individual officers" is that the decision whether and where to establish the checkpoint was left solely to Crowder's discretion without any supervision of or direction from a higher level administrator. *See Martinez-Fuerte*, 428 U.S. at 559 and *Lowe*, 230 Va. at 351, 337 S.E.2d at 277 (checkpoints operated under high level officials' supervision). Indeed, it is difficult to imagine a situation where a field officer, in establishing a checkpoint at his discretion and without a supervisor's knowledge, would not be acting with the "unbridled discretion" forbidden by *Prouse*, 440 U.S. at 663.

Furthermore, even if one disregards the absence of such a plan and weighs "the public concerns served by the seizure, the degree to which it advances the public interest, and the severity of the interference with individual liberty," *Brown*, 443 U.S. at 50-51, the checkpoint as described in this scant record is constitutionally deficient. The majority cites *Commonwealth v. Mitchell*, 355 S.W.2d 686, 688-89 (Ky. 1962); *Palmore v. United States*, 290 A.2d 573, 582 (D.C. 1972); and *State v. Holmberg*, 194 Neb. 337, 340, 231 N.W.2d 672, 675 (1975), for the proposition that the operation of a checkpoint serves the Commonwealth's "interest in protecting its motorists, passengers and pedestrians from unsafe drivers and vehicles." Neither *Palmore* (driver pulled over for a "spot check" by an unmarked police car although there were no violations and no cause to suspect criminal activity), nor *Holmberg* (driver stopped randomly by a state trooper for a check of his operator's license and vehicle registration) can survive constitutional scrutiny under the analysis of *Prouse*. Although *Mitchell* involved a " 'roadblock' by which state police indiscriminately stopped all traffic for the purpose of ascertaining whether [drivers had valid operator's licenses]," 355 S.W.2d at 687, the facts as recited in that case concerning the establishment and operation of the roadblock do not minimally satisfy the dicta in *Prouse* that "[q]uestioning of all oncoming traffic at roadblock-type stops" may satisfy fourth amendment concerns provided there are prohibitions against intrusive stops and "the unconstrained exercise of discretion." 440 U.S. at 663.

While there is a public interest in protecting the public from unsafe drivers and vehicles, the record does not demonstrate that Crowder's impromptu checkpoint effectuated the stated purpose of the checkpoint. No evidence establishes the reasons Crowder used this particular location; thus, we cannot determine whether the location of the checkpoint was based upon considerations of inconvenience to the public, safety of the operation, or potential for detecting and deterring equipment and operator license violations. *See United States v. Ortiz*, 422 U.S. 891, 894 (1975). Nor does the record disclose why park police were assisting in a check for license and equipment violations or why a check for equipment violations began at the late evening hour of 8 p.m. Furthermore, no evidence establishes that Crowder checked Simmons' operator's license or vehicle registration. These circumstances do not provide a basis upon which we can assess the validity of the stated purpose — to check license and vehicle equipment violations.

Moreover, the severity of the intrusion resulting from Crowder's discretionary and standardless infringement on the individual's right to and expectation of privacy weighs against the reasonableness of the seizure. "The 'grave danger' of abuse of discretion does not disappear simply because the automobile is subject to state regulation resulting in numerous instances of police-citizen contact." *Prouse*, 440 U.S. at 662. In the present case, Crowder stated that he was stopping vehicles solely for the purpose of checking for "driver's license and equipment violations." The Supreme Court in *Prouse* discussed the public interest in stopping vehicles to insure that drivers are properly licensed and their automobiles are properly registered. Since unlicensed drivers are presumably more likely to commit traffic offenses and, therefore, are more likely to be stopped, the benefit to the public interest by police randomly stopping drivers to check their licenses and registrations is minimal. 440 U.S. at 658-61. Similarly, in failing to establish that Crowder was operating upon any standards or guidelines for checking suspected equipment violations, there is no indication that more than a minimal public benefit flows from this kind of search for equipment violations.

That a checkpoint was used to intercept vehicles is not dispositive of the constitutionality of the seizure. In *United States v. Martinez-Fuerte*, 428 U.S. 543, 566 n.19 (1976) the Supreme Court stated: "Our holding today, approving routine stops for

brief questioning . . . is confined to permanent checkpoints." Unlike *Martinez-Fuerte* the checkpoint here was temporary, not permanent; moreover the location of the checkpoint was chosen by the officer in the field rather than by supervisory officials as in *Martinez-Fuerte* and *Lowe*. Here Crowder's discretion concerning site selection, and, thus, which vehicles to intercept, was not limited by the location of a permanent checkpoint. *See Ortiz*, 422 U.S. at 894. Crowder used his discretion in placing the checkpoint to meet whatever aims he deemed important, none of which are explained on this record, beyond the general goal of checking for license and equipment violations.

The record provides no basis upon which the trial court or this Court can conclude that this was a "reasonably located checkpoint." *Martinez-Fuerte*, 428 U.S. at 562. No evidence establishes whether the checkpoint was moved from time to time, or whether the site was selected to intercept an identifiable group of drivers. Absent such evidence, the conclusion is inescapable that citizens who were stopped at the checkpoint were subject to whatever whim may have controlled the curiosity of the officers operating the checkpoint. Having been set up at the late evening hour of 8 p.m., placed on a rural road, operated at the discretion of Crowder, and located at a place chosen at Crowder's discretion, the checkpoint had the characteristic of a roving patrol spot check, which was held unconstitutional in *United States v. Brignoni-Ponce*, 422 U.S. 873, 876 (1975).

"[T]he central concern of the Fourth Amendment is to protect liberty and privacy from arbitrary and oppressive interference by government officials." *Ortiz*, 422 U.S. at 895. Factors such as the isolated rural county road, questionable lighting suggested by the late evening hour, the absence of adequate warning signs, the lack of input and participation by supervisory personnel, and the absence of any limit on field officers' discretion negate the reasonableness of this type of arbitrarily established checkpoint. *See Martinez-Fuerte*, 428 U.S. at 565-66; *Webb v. State*, 695 S.W.2d 676, 681 (Tex. Ct. App. 1985) *aff'd as modified*, 739 S.W.2d 802 (Tex. Crim. App. 1987); *State v. McLaughlin*, 471 N.E.2d 1125, 1135-36 (Ind. App. 1984); *Jones v. State*, 459 So.2d 1068, 1077 (Fla. App. 1984). *See also Coolidge*, 403 U.S. at 450. The creation of such arbitrary, randomly placed checkpoints moves us "dangerously close to what may be referred to as a police state,"

*State v. Smith*, 674 P.2d 562, 564 (Okla. Crim. App. 1984), where citizens are stopped and "checked" at the whim of police officers in an effort to exercise tight control over the populace.

By prohibiting the unrestrained exercise of discretion, the fourth amendment guarantees that only the exercise of the legitimate police power of the state will be sanctioned.

> An individual operating or traveling in an automobile does not lose all reasonable expectation of privacy simply because the automobile and its use are subject to government regulation. Automobile travel is a basic, pervasive, and often necessary mode of transportation to and from one's home, workplace, and leisure activities. Many people spend more hours each day traveling in cars than walking on the streets. Undoubtedly, many find a greater sense of security and privacy in traveling in an automobile than they do in exposing themselves by pedestrian or other modes of travel. Were the individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed. As *Terry v. Ohio, supra*, recognized, people are not shorn of all Fourth Amendment protection when they step from their homes onto the public sidewalks. Nor are they shorn of those interests when they step from the sidewalks into their automobiles. *See Adams v. Williams*, 407 U.S. 143, 146 (1972).

*Prouse*, 440 U.S. at 662-63. Regardless of Crowder's testimony that he was operating in accordance with "normal procedures," the absence of evidence concerning "a plan embodying explicit, neutral limitations on the conduct of individual officers," *Brown*, 443 U.S. at 51, combined with Crowder's unbridled discretion to select the site and the manner of operation of the checkpoint, run afoul of the requirements of *Prouse, Ortiz, Brown, Martinez-Fuerte* and *Lowe*.

I would rely upon the holding in *Prouse* that Simmons, like other "persons in automobiles on public roadways[,] may not for that reason alone have [his] travel and privacy interfered with at the unbridled discretion of police officers." 440 U.S. at 663. For these reasons, I would reverse the conviction and dismiss the warrant.