435 S.E.2d 891 (1993)
Junior Franklin McCAULEY
v.
COMMONWEALTH of Virginia.
Record No. 0809-92-2.
Court of Appeals of Virginia.
September 28, 1993.
Rehearing En Banc Granted November 17, 1993.
Scott Goodman, for appellant.
Leah A. Darron, Asst. Atty. Gen. (Stephen D. Rosenthal, Atty. Gen., on brief), for appellee.
Present: MOON, C.J., and BENTON and FITZPATRICK, JJ.
MOON, Chief Judge.
Junior Franklin McCauley, appellant, appeals his conviction of driving after having been declared a habitual offender. We affirm and hold that the stop of appellant for the safety inspection pursuant to Code § 52-8.5 was not a violation of the fourth amendment.
On July 10, 1991, Trooper Rogers set up his commercial vehicle inspection site at the pre-designated location on East Route 250 near the Shadwell Exit of Interstate 64. Rogers observed a trash truck driven by appellant, Junior Franklin McCauley. Rogers stepped to the side of the road and motioned for appellant to pull over. Rogers *892 determined from the "spec" plate that appellant's truck weighed 34,000 pounds. Rogers proceeded with a motor carrier safety inspection and asked appellant for his driver's license and registration. Appellant told Rogers that he had misplaced his license. A record check revealed that appellant was a habitual offender. Rogers continued his inspection and found numerous safety defects.
Appellant contends that this stop was unconstitutional and contrary to the Supreme Court's decision in Simmons v. Commonwealth, 238 Va. 200, 380 S.E.2d 656 (1989), which relied on Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). We disagree with appellant and hold that Simmons is not dispositive of this case.
Delaware v. Prouse and its progeny do not dictate the outcome of this case. Prouse involved the random stop of automobiles to check driver's licenses and registrations. Virginia courts relying on Prouse have held that automobile roadblocks to check for license and registration must be carried out pursuant to plans embodying explicit, neutral limitations on the conduct of the individual officer. Simmons, 238 Va. at 202-03, 380 S.E.2d at 658. However, the Supreme Court carefully explained in Prouse that the ruling was not intended to "cast doubt on the permissibility of roadside truck weigh stations and inspections checkpoints, at which some vehicles may be subject to further detention for safety and regulatory inspection than are others." 440 U.S. at 663 n. 26, 99 S.Ct. at 1401 n. 26.
The proper line of cases in deciding this case begins with New York v. Burger, 482 U.S. 691, 703, 107 S.Ct. 2636, 2644, 96 L.Ed.2d 601 (1987), which held that warrantless inspections in the context of a regulated business are deemed reasonable so long as four criteria are met: the state has a substantial interest in regulating the industry; regulation of the industry must reasonably serve the state's interest and such warrantless administrative inspections must be necessary; the statute must inform a person operating in the industry that regular inspections will be made and set out the scope of the inspection notifying the person how to comply; and the "time, place and scope" must be limited and impose appropriate restraints on the inspectors' discretion.
In Burger, the Supreme Court held that a warrantless search of an automobile junkyard business was constitutional because the junkyard business was a pervasively regulated industry in which warrantless inspections were appropriate and the statute authorizing the inspection defined the scope of the inspection and limited the discretion of the officer in time, place and scope. 482 U.S. at 708-713, 107 S.Ct. at 2646-2649.
We must decide whether these factors were met in this case.
In 1984, Congress enacted the Motor Carrier Safety Act "... to promote the safe operation of commercial vehicles, to minimize dangers to the health of operators of commercial vehicles ... and to assure increased compliance with traffic laws and with the commercial motor vehicle safety and health rules, regulations, standards and orders issued pursuant to this Act." 49 U.S.C.A.App. § 2501 (1984). The Act requires that "each employer and employee shall comply with regulations pertaining to commercial motor vehicle safety... which are applicable to his or her own actions and conduct." 49 U.S.C.A.App. § 2504 (1984).
Code § 52-8.4 states in pertinent part:
A. The Superintendent of State Police... shall promulgate regulations pertaining to commercial motor vehicle safety pursuant to the United States Motor Carrier Act of 1984. These regulations shall set forth criteria relating to driver, vehicle, and cargo safety inspections with which motor carriers and transport carriers shall comply....
B. For purposes of this section:
1. "Commercial motor vehicle" means any self-propelled or towed vehicle used on the highways in interstate or intrastate commerce to transport passengers or property if such vehicle (i) has a gross vehicle weight ... rating of more than 26,000 pounds, (ii) is designed to transport more than fifteen passengers, *893 ... regardless of weight, or (iii) is used to transport hazardous materials....
2. "Motor carrier" means a common carrier by motor vehicle, a contract carrier by motor vehicle....
3. "Transport vehicle" means any vehicle owned or leased by a motor carrier used in the transportation of goods or persons.

* * * * * *
D. The Department of State Police, together with all other law-enforcement officers of the Commonwealth who have satisfactorily completed forty hours of on-the-job training and a course of instruction as prescribed by the U.S. Department of Transportation, Federal Highway Administration, Office of Motor Carriers, in federal motor carrier safety regulations, safety inspection procedures, and out-of-service criteria, shall enforce the regulations and other requirements promulgated pursuant to this section. Those law-enforcement officers certified to enforce the regulations and other requirements promulgated pursuant to this section shall annually receive in-service training in current federal motor carrier safety regulations, safety inspection procedures, and out-of-service criteria.
Section 3.17 of 49 C.F.R. 396.9(a), which the Virginia Register of Regulations 545-01-1, Motor Carrier Safety Regulations incorporated by reference effective July 9, 1986, provides:
Law enforcement officers of the Department of State Police specifically designated by the Superintendent are authorized to enter upon and perform inspections of motor carrier vehicles in operation.
Based on the facts of this case, it is clear that Trooper Rogers complied with the statute.
On July 10, 1991, Trooper Rogers had worked for the Virginia State Police for twenty years. For the previous six years, he worked exclusively conducting Motor Carrier Safety Regulation Compliance Inspections. Rogers conducted inspections of commercial vehicles during his eight hour shift from 8:00 a.m. to 4:00 p.m. He was trained for this job by completing a United States Department of Transportation Federal Highway Administration, Office of Motor Carriers training course and received an additional forty hours of mandatory training annually.
From 1986 to 1988 Rogers inspected commercial vehicles at a weigh station in a fixed location off of the interstates in Northern Virginia. In 1988, Rogers was transferred to the Albemarle County area, where there was no weigh station. When Rogers was transferred, only one site in Albemarle County had been deemed sufficiently safe to use for motor carriers inspections. After surveying the county, Rogers designated two additional inspection sites where there was not a high volume of traffic, where visibility was sufficient to allow commercial vehicles to stop safely, and where the area off the shoulder of the roadway was large enough to accommodate commercial vehicles.
Only vehicles having a minimum gross vehicle weight in excess of 26,000 pounds were subject to inspection, and Rogers initially decided which vehicles to inspect by their size. When he observed a commercial vehicle approaching his inspection site he would motion to the driver to slow down and pull over onto the shoulder of the road. Upon stopping the commercial vehicle, Rogers would first check the vehicle's "spec" plate located inside the driver's side door to ascertain the vehicle's weight. Only upon confirming that the vehicle was classified by weight as commercial (at least 26,000 lbs. pursuant to Code § 52-8.4(B)(1)(i)), would Rogers proceed to inspect the vehicle pursuant to the regulations he enforced as published in the Code of Federal Regulations.
During the inspection, Rogers would check the driver's license, medical information and hours of service, the vehicle's registration and driver inspection report. He would check the vehicle's emergency equipment, such as stopped vehicle warning devices and fire extinguisher, and mechanical equipment, such as steering, brakes, load, and load securing. Rogers would also verify whether the vehicle was hauling hazardous material. After completing the inspection *894 of one commercial vehicle, Rogers would flag down and stop the next qualifying vehicle that came along. We hold that Burger applies to the inspection of commercial motor vehicles. First, an important governmental interest is served in regulating the commercial motor vehicle industry, namely safety; second, the warrantless inspections of commercial vehicles are authorized by the regulations and there is a need for temporary checkpoints to further the regulatory scheme because many weigh stations can be easily avoided and truckers can communicate with each other and avoid any other fixed-point inspection stations; see State v. A-1 Disposal, 415 N.W.2d 595, 599 (Iowa 1987); third, Code § 52-8.4 and the federal regulations of the Motor Carrier Safety Act which have been adopted in Virginia require that motor carrier drivers be familiar with the inspection, repair and maintenance regulations, 49 C.F.R. 396.1, and authorize specially trained State Police officers, such as Trooper Rogers, to "enter upon and perform inspections of motor carrier vehicles in operation;" 49 C.F.R. 396.9(a); and fourth, Rogers conducted his inspections during daylight hours at the three temporary checkpoints available in his jurisdictions: he stopped only commercial vehicles, conducted an immediate inspection of each vehicle's status and detained for a limited and defined inspection only those vehicles subject to the statute.
Although the issue of a warrantless stop of a commercial motor vehicle pursuant to Code § 52-8.4 is one of first impression in Virginia, other states have held that warrantless stops of commercial vehicles made pursuant to statutory provisions regarding the regulation of commercial vehicles do not necessarily violate the fourth amendment. See Drive Trans. Corp. v. New York City Taxi & Limousine Comm'n, 134 Misc.2d 1035, 513 N.Y.S.2d 920 (N.Y.Super.1987); People v. Escano, 843 P.2d 111 (Colo.Ct.App.1992).
In Drive Trans. Corp., the Court held that because the taxicab business is a highly regulated industry and because spot checks are essential to serve as a credible deterrent to violations, the random stopping of the taxicab did not violate the fourth amendment.
We hold, that under these circumstances, Trooper Rogers' warrantless inspection of appellant's trash truck did not violate the fourth amendment because the regulation of commercial vehicles furthers an important government interest, warrantless inspection is necessary to further the regulatory scheme, the inspection program is known to all "motor carriers" pursuant to Code § 52-8.4 adopting of the Motor Carrier Safety Act, and the temporary checkpoint was reasonably limited in time, scope and duration.
Affirmed.
BENTON, Judge, dissenting.
The trial judge upheld the stop in this case relying upon this Court's decision in Simmons v. Commonwealth, 6 Va.App. 445, 371 S.E.2d 7 (1988). At the time the trial judge ruled in this case, Simmons had been overruled three years earlier by the Supreme Court. See Simmons v. Commonwealth, 238 Va. 200, 380 S.E.2d 656 (1989). All of the reasons that the trial judge relied upon were considered and overruled by the Supreme Court. The majority opinion ignores the patent error by the trial judge and concludes that the trial judge's decision can be upheld for other reasons. I disagree with the majority opinion's conclusion that the rationale of New York v. Burger, 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987), validates the discretionary, random roadside stop made in this case.
The [Supreme] Court long has recognized that the Fourth Amendment's prohibition on unreasonable searches and seizures is applicable to commercial premises, as well as to private homes. An owner or operator of a business thus has an expectation of privacy in commercial property, which society is prepared to consider to be reasonable. This expectation exists not only with respect to traditional police searches conducted for the gathering of criminal evidence but also with respect to administrative inspections designed to enforce regulatory statutes.
Id. at 699-700, 107 S.Ct. at 2642 (citations omitted).
*895 The record does not prove that the State of Virginia has promulgated regulations that allow a state police officer to randomly stop trucks at some arbitrarily chosen place on the roadside for an inspection as was done by the state police officer in this case. The record proved that Virginia has established fixed locations at various parts of the state where trucks are weighed and inspected. Under the guise of furthering an alleged "important government interest," the majority opinion upholds random, roving, warrantless stops of trucks without reasonable cause to believe that a violation of law has occurred. I dissent.
[T]he legitimacy of a [checkpoint] is determined by weighing the state's interests in establishing the [checkpoint] against the potential intrusions on personal privacy. To avoid constitutionally impermissible infringements on privacy, [a checkpoint] must be carried out pursuant to a plan or practice which is explicit, contains neutral criteria, and limits the conduct of the officers undertaking the [checkpoint]. Such a plan serves to insure that one's "reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field."
Simmons, 238 Va. at 202-03, 380 S.E.2d at 658 (citations omitted).
State police officer Rogers testified that no truck weigh stations or fixed truck inspection sites are located in the area of the state to which he was assigned. He testified that the State considered locating stations there but decided not to do so. When Rogers was assigned to that area, he decided to implement his own plan for checking trucks, and he personally selected three sites in the county to use. He did not consult any guidelines for selecting sites, and he did not obtain approval from any supervising authority. Moreover, he received no training that would enable him to determine that a given site was more suitable for a truck inspection operation. He conceded that another officer might have selected different sites. The decisions when, where, and how to stop trucks were made within his unbridled discretion.
Rogers testified that on a given day he would proceed to one of the places that he likes to use for stopping trucks and park his vehicle. He described his procedures as follows:
Q: And what is your procedure once you are at an inspection site?
A: I usually walk out to the side of the road and most of my sitesall of my sites ishas enough distance so that I can see the truck coming and when I see it coming, I step out to the shoulder of the road, started motioning for the traffic to slow down, and then usually truck driver will notice me and then I would motion him into my truck site.
Q: And how do you decide which truck you are going to inspect?
A: Well, normally from the size, from the distance, and once I get the truck into the inspection site, I usually get the driver to open the door so I can look at the spec plate on the side of the door, and what I'm looking for there is the GVW weight rating, and I'm looking for twenty-six thousand and one.
Q: Which classifies it as
A: As a commercial motor vehicle.
Q: And how do youafter you are done inspecting that truck, how do you pick the next truck?
A: Well, II walk back out to the side of the road, look for another truck coming down the highway and I motion the next one in.
Q: And what do you inspect these trucks for?
A: Normally I inspect them for their driver's license, registration, medical card, emergency equipment such as fire extinguishers, stopped vehicle warning devices, and then after I checkthen I check for their driver of the vehicle inspection report and after I get that information, I start checking the equipment on the vehicle such as steering, brakes, then I also walk around the vehicle to ascertain whether or not the load isis secure and try to determine whether or not he has the material.
The majority opinion euphemistically states that "Rogers set up his commercial vehicle inspection site ... on East Route 250." By alluding to "set up his commercial *896 vehicle inspection site," the majority attempts to bring the officer's random, unsupervised conduct into the umbrella of "permissib[le] ... roadside truck weigh stations and inspections check points" mentioned in Delaware v. Prouse, 440 U.S. 648, 663 n. 26, 99 S.Ct. 1391, 1401 n. 26, 59 L.Ed.2d 660 (1979). The officer had nothing to "set up." Simply put, Rogers, acting upon his own discretion, stopped his marked police vehicle at the side of the highway at a place he selected, stood on the highway, and raised his hand to stop trucks that passed by.
New York v. Burger involved the question whether a warrantless search of an automobile junkyard, conducted pursuant to a New York statute that authorized inspections of junkyards, fell "within the exception to the warrant requirement for administrative inspections of pervasively regulated industries." 482 U.S. at 693. The trial judge did not find that the inspection made in this case was valid because the operation of a truck on the highway is a "pervasively regulated business." The trial judge merely found that "Rogers was certainly within the law to conduct a traffic checkpoint for violations of the commercial vehicle law in Virginia." Merely because a business is regulated does not mean that it is "pervasively regulated." Moreover, even warrantless searches of regulated businesses must have some basis in the regulations.
Relying on the holding in Drive Trans Corp. v. New York City Taxi and Limousine Commission, 134 Misc.2d 1035, 513 N.Y.S.2d 920, 921 (1987), that the taxicab business is a pervasively regulated business, the majority concludes that any operator of a truck is engaged in a pervasively regulated business. That case does not support such a conclusion. In People v. Escano, 843 P.2d 111 (Colo.Ct.App.1992), the Court did not decide whether the operation of a truck was per se a pervasively regulated business. That case involved the interpretation of a Colorado statute that allowed an inspection when "a tractor-trailer rig [was driven] up to the scales" at a highway weigh station. Id. at 113. An inspection was performed after the truck was determined to be 4000 pounds overweight and the driver had only a learner's permit. The Escano Court approved the search in that case but stated that random searches, such as the one conducted by the officer in this case, were violative of the fourth amendment.
Warrantless administrative searches of commercial property do not necessarily violate the Fourth Amendment, but inspections of commercial property may be unreasonable if they are not authorized by law, are unnecessary for the furtherance of governmental interests, or are so random, infrequent, or unpredictable that the owner, for all practical purposes, has no real expectation that his property will be inspected from time to time by government officials.
Id. at 116. The Court found no violation in Escano because the inspection was performed at the weigh station by an officer who had "`reasonable cause to believe that the vehicle [was] being operated in violation of ... law.'" Id. at 116 quoting Colo. Code § 24-33.5-212(1)(b).
Furthermore, even if it is assumed, as the majority does, that operating a commercial truck places one within the scope of a "pervasively regulated business," the predicate for the application of rules announced in Burger, this case does not meet the requirements stated by the Supreme Court. Burger does not sanction random, roving, warrantless stops that are conducted in the absolute, unbridled discretion of the police officer acting without instruction or supervision.
This warrantless inspection, however, even in the context of a pervasively regulated business, will be deemed to be reasonable only so long as three criteria are met. First, there must be a "substantial" government interest that informs the regulatory scheme pursuant to which the inspection is made.
Second, the warrantless inspections must be "necessary to further [the] regulatory scheme...."
Finally, "the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant." In other words, the regulatory statute must perform the two basic functions of a warrant: it must advise *897 the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers. To perform this first function, the statute must be "sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." In addition, in defining how a statute limits the discretion of the inspectors, we have observed that it must be "carefully limited in time, place, and scope."
Burger, 482 U.S. at 702-03, 107 S.Ct. at 2644 (citations omitted).
The time, place, and scope of the random, roving inspection made by the officer in this case were determined solely by the officer who made the stop. The officer had complete discretion as to when, where, and how to make stops and to conduct the inspection. The officer performed inspections at a time that was suitable to his schedule. The officer selected the sites. Moreover, nothing in the record establishes that any type of predictable, guided criteria governed the scope of his search. Not all trucks are covered by the inspection regulations. Indeed, the officer's testimony demonstrated that because he did not have weighing scales at his randomly selected roadside locations, he could not immediately discern which trucks exceeded the 26,000 GVW rating and were subject to inspections. He only determined whether a truck was subject to inspection after he stopped the truck, opened the door of the truck, and read the specification plate on the door panel. Moreover, prior to stopping McCauley's truck, the officer did not have any evidence of a violation of laws and did not observe improper operation of the truck.
The procedure that was implemented "unnecessarily left the individual trooper with such broad discretion that it was subject to abuse." Hall v. Commonwealth, 12 Va.App. 972, 975, 406 S.E.2d 674, 676 (1991). "This kind of standardless and unconstrained discretion is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent." Prouse, 440 U.S. at 661, 99 S.Ct. at 1400. As in Simmons, the proof here demonstrated the unreasonableness of the procedure.
The evidence in this case establishes that the decision to establish the [checkpoint] as well as its location and duration was solely within the discretion of the troopers. No advance approval or authorization from any supervisor or superior officer was required to set up the [checkpoint]. A statement that the troopers followed standard operating procedure... is not sufficient to establish that an explicit plan or practice existed regarding... check point procedures.
238 Va. at 204, 380 S.E.2d at 659.
For these reasons, I would hold that the procedure for randomly stopping trucks at arbitrarily selected roadside locations was conceived and operated in the unbridled discretion of this officer and was unreasonable. Accordingly, I would reverse the conviction.

Upon a Petition for Rehearing En Banc Before the Full Court
On October 6, 1993 came the appellant, by court-appointed counsel, and filed a petition praying that the Court set aside the judgment rendered herein on September 28, 1993 and grant a rehearing en banc thereof.
On consideration whereof, the petition for rehearing en banc is granted, the mandate entered herein on September 28, 1993 is stayed pending the decision of the Court en banc, and the appeal is reinstated on the docket of this Court.
The parties shall file briefs in compliance with Rule 5A:35. It is further ordered that the appellant shall file with the clerk of this Court ten additional copies of the appendix previously filed in this case.